```
 1                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4
   UNITED STATES OF AMERICA ) CRIMINAL DOCKET NO.
 5                          ) 1:20-CR-103-TWT-LTW
                            )
 6                          ) ATLANTA, GEORGIA
                            ) MAY 4, 2021
 7            V.            )
                            )
 8  BANGALLY TOURAY,        )
                            )
 9        DEFENDANT.        )

10

11            TRANSCRIPT OF EVIDENTIARY HEARING
            BEFORE THE HONORABLE LINDA T. WALKER
12              UNITED STATES MAGISTRATE JUDGE

13
   APPEARANCES OF COUNSEL:
14
   FOR THE GOVERNMENT:      NICHOLAS N. JOY
15                          OFFICE OF THE U. S. ATTORNEY

16 FOR THE DEFENDANT:       MICHAEL H. SAUL
                            MICHAEL T. ROSS
17

18
   COURT REPORTER:          ANDY ASHLEY
19                          1949 U. S. COURTHOUSE
                            ATLANTA, GEORGIA  30303-3361
20                          (404) 215-1478

21

22
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
23 PRODUCED BY COMPUTER.

24

25
```

1                    P R O C E E D I N G S

2    (ATLANTA, FULTON COUNTY, GEORGIA; MAY 4, 2021

3    IN OPEN COURT.)

4            THE COURT:  THE COURT CALLS THE CASE OF THE UNITED

5    STATES OF AMERICA VERSUS BANGALLY TOURAY.  THIS IS CASE NUMBER

6    1:20-CR-103.  WE HAVE APPEARING ON BEHALF OF THE GOVERNMENT

7    NICHOLAS JOY, AND APPEARING ON BEHALF OF THE DEFENDANT, WE HAVE

8    MICHAEL SAUL AND MICHAEL ROSS.

9            WE'RE HERE THIS MORNING BECAUSE AN INDICTMENT HAS

10   BEEN FILED AGAINST THE DEFENDANT.  HE HAS FILED A MOTION TO

11   SUPPRESS SEARCH AND SEIZURE OF HIMSELF AS WELL AS A CELLPHONE

12   THAT WAS SEIZED AT THE UNITED STATES BORDER ON OR ABOUT MAY OF

13   2019.

14           IS THE GOVERNMENT READY TO PROCEED?

15           MR. JOY:  YES, YOUR HONOR.

16           THE COURT:  IS THE DEFENSE READY TO PROCEED?

17           MR. SAUL:  YES, YOUR HONOR.

18           THE COURT:  YOU MAY PROCEED AT THIS TIME.

19           MR. JOY:  THANK YOU.  YOUR HONOR, THE GOVERNMENT

20   CALLS CBP OFFICER JOHN COSTANZA.

21           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

22   OATH.

23                   JOHN A. COSTANZA,

24   HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

25           THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

1  STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

2  ALSO.

3            THE WITNESS:  JOHN A. COSTANZA,

4  C O S T A N Z A.

5                    DIRECT EXAMINATION

6  BY MR. JOY:

7  Q.   OFFICER COSTANZA, WHERE DO YOU WORK?

8  A.   AT THE JOHN F. KENNEDY AIRPORT.

9  Q.   AND FOR WHAT AGENCY DO YOU WORK?

10 A.   CUSTOMS AND BORDER PROTECTION.

11            THE COURT:  EXCUSE ME, CAN YOU MOVE UP A LITTLE BIT

12 CLOSER TO THE MIKE?

13            THE WITNESS:  SURE.

14            THE COURT:  THANK YOU.

15            THE WITNESS:  CUSTOMS AND BORDER PROTECTION.

16 BY MR. JOY:

17 Q.   AND WHAT'S YOUR TITLE WITH CUSTOMS AND BORDER PROTECTION?

18 A.   A CBP OFFICER.

19 Q.   HOW LONG HAVE YOU BEEN A CBP OFFICER?

20 A.   18 YEARS.

21 Q.   AND IN MAY OF 2019, WHAT UNIT WERE YOU WITH?

22 A.   A-TCET, ANTI-TERRORISM CONTRABAND ENFORCEMENT TEAM.

23 Q.   ALL RIGHT.  AND WHAT DOES A-TCET DO?

24 A.   A-TCET ENFORCES CURRENCY LAWS.  THEY DO CURRENCY EXAMS FOR

25 FLIGHTS DEPARTING THE COUNTRY.  WE ALSO DO NARCOTICS STUFF AND

1 ALSO TERRORIST RELATED STUFF.

2 Q.   ALL RIGHT.  AND SO AS PART OF YOUR JOB, WOULD YOU DO

3 INBOUND AND OUTBOUND BORDER SEARCHES?

4 A.   MOSTLY I DID OUTBOUND, BUT I DID ALSO DO INBOUNDS, INBOUND

5 LIKE CARGO FOR NARCOTICS, INBOUND COMMERCIAL FLIGHTS ALSO FOR

6 NARCOTICS.

7 Q.   WHEN YOU DO A BORDER SEARCH, WAS IT YOUR CUSTOM TO WRITE

8 AN INCIDENT REPORT?

9 A.   YES.

10 Q.   AND ABOUT HOW LONG AFTER THE EVENTS WOULD YOU GENERALLY

11 WRITE THIS REPORT?

12 A.   IT'S USUALLY DONE BEFORE THE END OF YOUR SHIFT.

13 Q.   ALL RIGHT.  AND WHY DO YOU TRY TO DO IT BEFORE THE END OF

14 YOUR SHIFT?

15 A.   WELL, IT'S KIND OF A REQUIREMENT THAT YOU DO THEM BEFORE

16 THE END OF EACH SHIFT UNLESS THERE'S SOME CIRCUMSTANCES THAT

17 WOULD PREVENT THAT FROM HAPPENING, BUT ALSO BECAUSE IT'S FRESH

18 IN YOUR MIND SO YOU CAN REMEMBER THE STUFF BESIDES HAVING

19 NOTES.

20 Q.   CAN IT BE HARD TO REMEMBER EACH INDIVIDUAL BORDER SEARCH

21 THAT YOU PERFORMED?

22 A.   YES, WE DO A LOT OF PASSENGERS, A LOT OF DIFFERENT EXAMS,

23 SO THERE'S A LOT OF STUFF THAT WE DO, LIKE I MEAN IN AN 8-HOUR

24 PERIOD YOU COULD WORK NONSTOP WITH NO BREAK, AND THERE'S JUST

25 SO MUCH STUFF THAT YOU'RE DOING.  SO, YEAH, IF YOU DIDN'T TAKE

1  NOTES OR, YOU KNOW, SOME TIME HAD LAPSED, THEN YOU COULD HAVE

2  TROUBLE REMEMBERING THE INCIDENT.

3  Q.   ALL RIGHT.  I'D LIKE TO TALK TO YOU ABOUT AN OUTBOUND

4  BORDER SEARCH THAT TOOK PLACE ON MAY 12TH OF 2019.  DO YOU

5  RECALL BEING ASKED TO DO AN OUTBOUND BORDER SEARCH BY HSI?

6  A.   YES.

7  Q.   CAN YOU TELL US A LITTLE BIT WHAT YOU RECALL OF HOW THAT

8  CAME TO PASS?

9  A.   SO WE DID AN EXAM, HSI ASKED US TO DO A STOP ON A SUBJECT

10 TO SEE IF HE WAS TAKING CURRENCY OUT OF THE COUNTRY, SO WE DID

11 AN OUTBOUND EXAM TO VERIFY.

12 Q.   AND WHERE GENERALLY WAS THIS OUTBOUND EXAM PERFORMED?

13 A.   IT WOULD BE IN A PRIVATE AREA IN A JETWAY.

14 Q.   AND JUST TO BE CLEAR, A JETWAY AT WHAT AIRPORT?

15 A.   JFK.

16 Q.   AND WHERE IS JFK LOCATED?

17 A.   NEW YORK, JAMAICA, NEW YORK.

18 Q.   WAS THE INDIVIDUAL THAT YOU PERFORMED THE BORDER SEARCH ON

19 AT THE REQUEST OF HSI BANGALLY TOURAY?

20 A.   YES.

21 Q.   OKAY.  DID YOU FIND ANY U.S. CURRENCY DURING THIS BORDER

22 SEARCH?

23 A.   SIR, IT WAS TWO YEARS AGO, BUT BASED ON, YOU KNOW, HAVING

24 READ MY NARRATIVE AND STUFF LIKE THAT TO KIND OF REFRESH MY

25 MEMORY A LITTLE BIT, THE SUBJECT HAD REPORTED 14,000 DOLLARS

1  AND HAD A LITTLE BIT LESS THAN THAT.

2  Q.   DO YOU RECALL IF MR. TOURAY WHILE YOU WERE TALKING TO HIM

3  APPEARED NERVOUS?

4  A.   AS I SAID BEFORE, BASED ON, YOU KNOW, MY NOTES THAT HE WAS

5  NERVOUS AT THE TIME A PATDOWN WAS PERFORMED.

6  Q.   AND BASED ON YOUR NOTES, DO YOU RECALL WHETHER MR. TOURAY

7  WAS SWEATING PROFUSELY AND HAVING TROUBLE WITH ANSWERS?

8  A.   YES, SIR.

9  Q.   CAN YOU GIVE THE COURT A LITTLE BIT OF A RUNDOWN ABOUT HOW

10  YOU WOULD GENERALLY GO THROUGH AN OUTBOUND BORDER SEARCH FOR

11  CURRENCY; WHAT YOUR STANDARD STEPS WOULD BE?

12  A.   SO WHEN YOU WOULD STOP A PASSENGER, YOU WOULD IDENTIFY

13  YOURSELF, TELLING THEM WE'RE U.S. CUSTOMS AND BORDER

14  PROTECTION, THAT WE'RE DOING -- WE'RE TALKING TO PASSENGERS

15  ABOUT TAKING MONEY OUT OF THE COUNTRY, THAT THEY CAN TAKE AS

16  MUCH MONEY AS THEY WANT, BUT IF THEY HAVE OVER 10,000 DOLLARS

17  THEY'VE GOT TO REPORT IT, AND THAT INCLUDES ANY MONEY THAT

18  THEY'RE TAKING FOR ANYONE ELSE SUCH AS FAMILY, FRIENDS OR AN

19  ORGANIZATION, AND YOU WOULD ASK THEM TO REPORT HOW MUCH THEY

20  HAD, YOU KNOW, YOU'D ASK, YOU KNOW, YOU WOULD ASK, YOU KNOW,

21  AGAIN, LIKE I WOULD ASK A COUPLE OF TIMES TO MAKE SURE THAT,

22  YOU KNOW, IF YOU HAVE ANY OTHER MONEY THAT BELONGS TO ANYONE

23  ELSE BECAUSE SOMETIMES PEOPLE THINK THAT IF THEIR AUNT, FOR

24  EXAMPLE, GAVE MONEY THAT THEY DON'T HAVE TO REPORT THAT MONEY,

25  SO YOU MAKE IT CLEAR THAT THEY HAVE TO REPORT THE TOTAL AMOUNT

1  OF MONEY.

2          AND THEN ONCE THAT'S ESTABLISHED, THEN YOU KNOW THAT

3  THEY, YOU KNOW, THAT THEY UNDERSTAND THE ENGLISH LANGUAGE, AND

4  THAT THEY UNDERSTAND WHAT YOU'RE EXPLAINING TO THEM, AND THAT

5  YOU ALSO GIVE THEM THE 909 FORM WHICH HAS THE LAW IN IT THAT

6  THEY CAN READ.

7          SO ONCE YOU'RE SATISFIED THAT THEY UNDERSTOOD, YOU

8  HAVE THEM WRITE THE AMOUNT DOWN ON THE FORM, AND SIGN, AND THEN

9  AFTER THAT YOU WOULD DO THE EXAM.

10 Q.   ALL RIGHT.  AND IN THE COURSE OF THESE EXAMS,

11 CONVERSATIONS, DO YOU EVER FIND CELLPHONES ON INDIVIDUALS?

12 A.   MOST OF THE TIME MEANING APPROXIMATELY EVERYBODY HAS A

13 CELLPHONE.  SOME PEOPLE HAVE MULTIPLE CELLPHONES.

14 Q.   AND DO YOU RECALL SPECIFICALLY WHETHER YOU FOUND A

15 CELLPHONE ON MR. TOURAY DURING THIS BORDER SEARCH?

16 A.   I DON'T REMEMBER THAT.

17 Q.   WHO WAS THE INDIVIDUAL FROM HOMELAND SECURITY

18 INVESTIGATIONS WHO REQUESTED THAT YOU PERFORM THIS BORDER

19 SEARCH?

20 A.   THAT'S AGENT DAN, DAN -- WHAT'S HIS LAST NAME, I FORGOT.

21 Q.   IS THERE SOMETHING THAT WOULD REFRESH YOUR RECOLLECTION?

22 A.   SURE.

23 Q.   WHAT WOULD REFRESH YOUR RECOLLECTION?

24 A.   DO YOU HAVE MY -- A COPY OF THE NARRATIVE THAT I WROTE?

25 Q.   I DO.

1 A.   AM I ALLOWED TO LOOK AT THE --

2 Q.   SO I'M GOING TO HAND YOU A COPY OF THE INCIDENT REPORT

3 THAT YOU WROTE, YOU CAN TAKE A LOOK AT IT, AND WHEN YOU'RE

4 FINISHED, YOU CAN LOOK UP, AND I'LL RETRIEVE IT FROM YOU?

5 A.   OKAY.  SO THAT'S AGENT SYMONDS.

6          MR. JOY:  MAY I HAVE ONE MOMENT, YOUR HONOR?

7          THE COURT:  YES, YOU MAY.

8          (PAUSE IN THE PROCEEDINGS.)

9          MR. JOY:  I HAVE NO FURTHER QUESTIONS FOR THIS

10 WITNESS, YOUR HONOR.

11          THE COURT:  YOUR WITNESS, MR. SAUL.

12          MR. SAUL:  YES, YOUR HONOR.

13                    CROSS-EXAMINATION

14 BY MR. SAUL:

15 Q.   OFFICER COSTANZA --

16 A.   YES.

17 Q.   I'M MICHAEL SAUL.  I HAVE A FEW QUESTIONS.  OFFICER

18 SYMONDS ASKED YOU TO STOP BANGALLY TOURAY?

19 A.   YES, SIR.

20 Q.   YOU HAD NO PERSONAL KNOWLEDGE OF MR. TOURAY BEFORE YOU

21 STOPPED HIM?

22 A.   NO, SIR.

23 Q.   YOU HAD -- IF OFFICER SYMONDS HAD NOT ASKED YOU TO STOP

24 HIM, YOU WOULD HAVE HAD NO REASON TO APPROACH HIM?

25 A.   NO, EXACTLY.

1  Q.   THAT'S CORRECT.  AND MR. -- AS YOU TESTIFIED THAT MR. --
2  YOU TESTIFIED THAT IT'S TYPICAL THAT WHEN YOU APPROACH SOMEONE
3  YOU TELL THEM WHAT THE RULES ARE?
4  A.   CORRECT.
5  Q.   AND PART OF THE RULES IS THAT THEY HAVE TO FILL OUT A FORM
6  NOTIFYING THE GOVERNMENT THAT THEY'RE TAKING MORE THAN 10,000
7  DOLLARS OUT OF THE COUNTRY IF THAT IS TRUE?
8  A.   YES, THAT WOULD BE A FINCEN 105.
9  Q.   AND MR. TOURAY HAD ALREADY FILLED OUT THAT FORM?
10  A.   YES, SIR.
11  Q.   AND MR. TOURAY COOPERATED WITH YOU AT ALL TIMES TO THE
12  BEST OF YOUR KNOWLEDGE?
13  A.   TO THE BEST OF MY KNOWLEDGE, YES.
14  Q.   AND YOUR REPORT DOESN'T SHOW THAT HE DID NOT COOPERATE?
15  A.   NO, SIR.
16  Q.   THAT'S CORRECT WHAT I SAID?
17  A.   CORRECT, UH-HUH (AFFIRMATIVE).
18  Q.   AND IS IT YOUR POSITION THAT YOU CAN STOP ANYBODY FOR ANY
19  REASON IN YOUR DISCRETION?
20  A.   YES, SIR, IT'S A BORDER SEARCH.
21  Q.   SO IF I WAS AT THE AIRPORT NEAR YOU, YOU COULD HAVE
22  STOPPED ME EVEN IF I WASN'T FLYING OUT OF THE COUNTRY?
23  A.   NO.  WE STOP PEOPLE INSIDE THE JETWAY ONCE THEY'VE SCANNED
24  THEIR BOARDING PASS AND PASSED THAT POINT OF THE AIRLINE.  SO
25  ONCE THEY'VE COMMITTED TO TAKING THAT FLIGHT INTERNATIONAL,

1  THAT'S WHERE WE STOP THEM IN THE JETWAY.

2  Q.   SO AFTER THEY GO THROUGH SECURITY?

3  A.   THEY PASS TSA, BUT WE USUALLY WAIT ALSO AFTER, YOU KNOW,

4  WHEN YOU SCAN YOUR TICKET AT THE GATE AND YOU START TO WALK

5  DOWN THAT FINAL JETWAY TO THE PLANE, THAT'S WHERE WE USUALLY

6  STOP THEM.  SO ONCE THEY'VE COMMITTED TO TAKING THAT

7  INTERNATIONAL FLIGHT, THAT'S WHEN WE STOP THEM.

8  Q.   AND ONLY PEOPLE THAT ARE GOING TO FLY ELSEWHERE ARE IN

9  THAT AREA?

10  A.   WELL, ONCE THEY'RE INSIDE THAT JETWAY, THEY'RE JUST TAKING

11  THAT ONE PARTICULAR FLIGHT SO THEY'RE NOT GOING ON DOMESTIC OR

12  ANYTHING LIKE THAT, THEY'RE NOT GOING ANYWHERE ELSE.

13  Q.   PEOPLE WHO WORK THERE THAT AREN'T GOING TO FLY; IS THAT

14  TRUE?

15  A.   YES, SIR.

16  Q.   SO THEY WOULD ALSO BE SUBJECT TO YOUR SEARCH?

17  A.   YOU WOULD SEE PEOPLE THAT PUSH THE WHEELCHAIRS GOING BACK

18  AND FORTH, AND YOU SEE THE AIRLINE REPS GOING BACK AND FORTH,

19  BUT OTHER THAN THAT YOU DON'T SEE USUALLY ANYONE ELSE INSIDE

20  THE JETWAY.

21  Q.   IS IT YOUR POSITION YOU COULD HAVE STOPPED THE WHEELCHAIR

22  PERSON?

23  A.   IF YOU THOUGHT THEY SHOULDN'T BE THERE, YOU HAVE TO

24  QUESTION WHY THEY WERE THERE.  IF THERE WAS AN UNAUTHORIZED

25  PERSON IN THAT JETWAY, YOU COULD STOP THEM AND ASK THEM, YOU

1  KNOW, WHAT THEY'RE DOING, WHERE THEY'RE SUPPOSED TO BE, ET

2  CETERA, JUST ASK THEM SOME QUESTIONS.

3  Q.   NO, BUT COULD YOU STOP AND QUESTION THEM AND SEARCH THEM

4  JUST BECAUSE, YOU KNOW, YOU'RE HAVING A BAD DAY, AND YOU WANTED

5  TO HARASS SOMEBODY?

6  A.   NO, IT WOULDN'T BE TO HARASS SOMEBODY.  IT WOULD BE IF --

7  WELL, IN THE AIRPORT THERE'S A LOT OF WHAT THEY CALL INTERNAL

8  CONSPIRACY.  THERE'S A LOT OF -- THERE'S PEOPLE THAT WORK FOR

9  THE AIRLINES THAT FACILITATE THEIR EMPLOYMENT TO SMUGGLE DRUGS

10 TO BYPASS SECURITY.

11         SO IF YOU SUSPECT THAT SOMEBODY WAS DOING SOMETHING

12 THAT THEY WEREN'T SUPPOSED TO BE, IF THEY WERE IN AN AREA THAT

13 THEY WERE NOT SUPPOSED TO BE BECAUSE WHEN YOU'RE DOING AN

14 INTERNATIONAL FLIGHT ONLY THE PEOPLE WORKING WITH THAT FLIGHT

15 ARE SUPPOSED TO BE IN THAT AREA, SO, YES, WE COULD STOP THEM

16 AND JUST SEE WHAT WAS GOING ON.

17 Q.   IF YOU HAD A REASON TO?

18 A.   YES, IF YOU HAD A REASON.

19 Q.   AND OTHER THAN AGENT/OFFICER SYMONDS TELLING YOU TO STOP

20 MR. TOURAY, YOU HAD NO REASON TO STOP HIM?

21 A.   IF WE WERE WORKING THAT FLIGHT JUST MAKING RANDOM STOPS,

22 AND HE WAS WALKING IN A JETWAY, WE COULD STOP HIM OR ANY OTHER

23 PASSENGER THAT WAS TAKING THAT FLIGHT.

24 Q.   BUT YOU WEREN'T WORKING THAT PARTICULAR FLIGHT THAT DAY?

25 A.   YES, WE DID WORK THAT FLIGHT.

1 Q.   AND THAT WAS BASED ON AGENT/OFFICER SYMONDS' INSTRUCTIONS?

2 A.   YES, SIR.

3 Q.   WHAT IS HSI?

4 A.   HOMELAND SECURITY INVESTIGATIONS.

5 Q.   DO YOU RECALL IF MR. TOURAY SPOKE ENGLISH?

6 A.   IT WAS TWO YEARS AGO, SO I DON'T REALLY REMEMBER HIM.  I'M

7 ONLY GOING OFF OF MY NOTES FROM MY RECOLLECTION, BUT I BELIEVE

8 HE SPOKE ENGLISH.

9 Q.   BUT YOU DON'T REMEMBER IF IT WAS EASY TO UNDERSTAND --

10 A.   WELL, IF SOMEBODY DOESN'T SPEAK ENGLISH, THEN IT WOULD

11 HAVE BEEN NOTATED IN THE NOTES LIKE, FOR EXAMPLE, IF THEY SPOKE

12 SPANISH, THEN YOU COULD NOTATE THAT YOU HAD AN INTERPRETER TO

13 TRANSLATE WHAT WAS EXPLAINED TO HIM IN THE SPANISH LANGUAGE AS

14 AN EXAMPLE.

15          MR. SAUL:  THAT'S ALL.  THANK YOU.

16          THE COURT:  OKAY.  ANY OTHER QUESTIONS OF THIS

17 WITNESS, MR. JOY?

18          MR. JOY:  YES, YOUR HONOR, JUST BRIEFLY.

19                    REDIRECT EXAMINATION

20 BY MR. JOY:

21 Q.   OFFICER COSTANZA, JUST TO CLEAR UP, IS IT YOUR

22 UNDERSTANDING THAT YOUR BORDER SEARCH AUTHORITY IS LIMITED TO

23 SEARCHING PEOPLE WHO ARE GOING TO BE ENTERING OR EXITING THE

24 UNITED STATES ON AN INTERNATIONAL FLIGHT?

25 A.   YES, SIR.

1  Q.   AND YOU SAID THAT YOU PERFORMED THE SEARCH ON THE JETWAY;

2  IS THAT CORRECT?

3  A.   YES, SIR.

4  Q.   AND SO MR. TOURAY WOULD HAVE ALREADY PRESENTED HIS TICKET

5  IN ORDER TO BOARD THE FLIGHT?

6  A.   YES, SIR, HE WOULD'VE SCANNED HIS TICKET AT THE DESK RIGHT

7  BEFORE ENTERING THE JETWAY.

8  Q.   ALL RIGHT.  AND IT'S BASICALLY THE ONLY DIRECTION THAT THE

9  JETWAY WAS HEADING TO TO THIS FLIGHT THAT WAS ABOUT TO TAKE OFF

10  INTERNATIONALLY?

11  A.   YES, SIR.

12  Q.   AND WAS IT YOUR UNDERSTANDING THAT YOU HAD AUTHORITY TO

13  PERFORM A BORDER SEARCH BECAUSE MR. TOURAY WAS IN THE PROCESS

14  OF TAKING AN OUTBOUND INTERNATIONAL FLIGHT?

15  A.   YES, SIR.

16         MR. JOY:  I HAVE NO FURTHER QUESTIONS.

17         THE COURT:  MR. SAUL, ANYTHING ELSE OF THIS WITNESS?

18         MR. SAUL:  YES, YOUR HONOR.

19                   RECROSS-EXAMINATION

20  BY MR. SAUL:

21  Q.   OFFICER COSTANZA, DID OFFICER SYMONDS TELL YOU THAT THEY

22  WEREN'T GOING TO MAKE ANY SEIZURES?

23  A.   SO GOING OFF OF MY NOTES, HE HAD SAID THAT THEY WERE GOING

24  TO SEIZE THE MONEY, AND THEN WE WERE WAITING FOR HIM, AND THEN

25  HE SAID OKAY, WE'RE NOT GOING TO SEIZE THE MONEY, TO LET HIM

1  GO.

2  Q.   AND YOUR REPORT SAYS AFTER SYMONDS THEN STATED AFTER

3  SPEAKING WITH HIS OFFICE THAT HIS OFFICE DID NOT WANT TO TAKE

4  THE SEIZURE?

5  A.   CORRECT.

6  Q.   AND IT DOESN'T REFER TO ONLY THE MONEY?

7  A.   THAT'S WHAT I'M -- WHEN I SAY SEIZURE, I MEAN SEIZURE OF

8  CURRENCY.

9  Q.   OKAY.  AND HIS CHECKED BAGS WERE YOU ALL GOING TO SEARCH

10  THOSE?

11  A.   WE USUALLY DO SEARCH ALSO CHECKED BAGS.

12  Q.   AND THE PURPOSE OF THAT IS?

13  A.   PEOPLE ALSO SMUGGLE MONEY IN CHECKED BAGS.

14  Q.   YOU ALL DID NOT SEARCH THE BAG, HIS BAGS?

15  A.   I DON'T REMEMBER.  USUALLY WE DO UNLESS IT WAS A LAST

16  MINUTE THING AND WE DIDN'T HAVE TIME, BUT USUALLY WE DO SEARCH

17  THE BAGS.

18  Q.   AND JUST TO CLEAR UP, AT THE END OF YOUR ENCOUNTER WITH

19  MR. TOURAY, YOU GAVE HIM BACK HIS MONEY AND PRESUMABLY HE WENT

20  TO WHEREVER HE WAS PLANNING TO TRAVEL TO?

21  A.   YES, SIR.

22          MR. SAUL:  THANK YOU.

23          THE COURT:  MAY THIS WITNESS BE EXCUSED, MR. JOY?

24          MR. JOY:  YES, YOUR HONOR.

25          THE COURT:  THANK YOU.  YOU MAY STEP DOWN, AND YOU'RE

1  EXCUSED.  YOU MAY CALL YOUR NEXT WITNESS, MR. JOY.

2          MR. JOY:  THE GOVERNMENT CALLS HSI SPECIAL AGENT

3  DANIEL SYMONDS.

4          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

5  OATH.

6                  DANIEL P. SYMONDS,

7  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

8          THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

9  STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

10  ALSO.

11          THE WITNESS:  DANIEL PAUL SYMONDS, SYMONDS IS

12  S Y M O N D S.

13          THE COURT:  YOU MAY PROCEED, MR. JOY.

14          MR. JOY:  THANK YOU, YOUR HONOR.

15                  DIRECT EXAMINATION

16  BY MR. JOY:

17  Q.   SPECIAL AGENT SYMONDS, WHERE DO YOU WORK?

18  A.   I WORK FOR HOMELAND SECURITY INVESTIGATIONS AT JFK

19  AIRPORT.

20  Q.   AND HOW LONG HAVE YOU WORKED WITH HOMELAND SECURITY

21  INVESTIGATIONS?

22  A.   WITH HOMELAND SECURITY ABOUT 12 YEARS.

23  Q.   AND WHAT'S YOUR TITLE WITH HSI?

24  A.   SPECIAL AGENT.

25  Q.   AND ABOUT HOW LONG HAVE YOU BEEN WORKING SPECIFICALLY AT

1    JFK?

2    A.    I'M WORKING FIVE YEARS AT JFK WITH THE FINANCIAL GROUP.

3    Q.    AND DID YOU RECEIVE A REPORT ON MAY 12TH, 2019 ABOUT AN

4    INDIVIDUAL THAT AGENTS IN ATLANTA WERE INTERESTED IN WHO WAS

5    TAKING AN INTERNATIONAL FLIGHT?

6    A.    YES.

7    Q.    CAN YOU TELL US A LITTLE BIT ABOUT HOW THAT CAME ABOUT?

8    A.    WELL BEING IN THE FINANCIAL GROUP, WE HAVE DUTY DAYS.  I

9    WAS ON DUTY THAT DAY, AND I WAS CONTACTED BY SPECIAL AGENT

10   MATTHEW DEVANE, AND HE TOLD ME HE HAD A SUBJECT WHO WAS

11   DEPARTING THE UNITED STATES, AND THAT HE WANTED TO HAVE AN

12   OUTBOUND EXAMINATION CONDUCTED ON HIM.  HE SENT ME LINKS OF HOW

13   HE'S ASSOCIATED WITH THIS CRIMINAL INVESTIGATION THAT'S ONGOING

14   AND REQUESTED THAT WE DETAIN HIS PHONE.

15   Q.    WAS IT YOUR UNDERSTANDING FROM SPECIAL AGENT DEVANE THAT

16   MR. TOURAY HAD BEEN FOUND WITH A LARGE QUANTITY OF U.S.

17   CURRENCY ON AN AIRLINE FLIGHT PREVIOUSLY?

18   A.    YES.

19   Q.    WAS MR. TOURAY ATTEMPTING TO BOARD AN AIRLINE FLIGHT TO

20   BRUSSELS?

21   A.    YES.

22   Q.    AND DID HIS ITINERARY CONNECT TO BANJUL, GAMBIA?

23   A.    YES.

24   Q.    ONCE YOU RECEIVED THIS INFORMATION FROM SPECIAL AGENT

25   DEVANE, WHAT DID YOU DO NEXT?

1  A.   CONFIRMED WITH CBP, CUSTOMS AND BORDER PROTECTION, THAT

2  THEIR OUTBOUND EXAM WAS SET FOR HIS SUBJECT, AND I CONFIRMED

3  WITH THEM THAT I'LL BE ON THE SITE TO DETAIN THE PHONE.

4  Q.   AND DID YOU ARRIVE WHILE THE BORDER SEARCH WAS BEING

5  CONDUCTED?

6  A.   YES.

7  Q.   DID YOU -- WHAT HAPPENED ONCE YOU ARRIVED?

8  A.   WHEN I ARRIVED, A CBP OFFICER PROVIDED ME THE SUBJECT'S

9  PHONE AND PASSCODE.  HE SAID THE PASSCODE DIDN'T WORK.  AT THAT

10  POINT I STARTED FILLING OUT THE CHAIN OF CUSTODY WITH THE

11  SUBJECT'S INFORMATION, NAME, ADDRESS, AND THEN PROCEEDED TO

12  FILL OUT THE CHAIN OF CUSTODY FOR DETAINING OF THE PHONE.

13  Q.   DID YOU UNDERSTAND WHETHER ANY U.S. CURRENCY HAD BEEN

14  FOUND ON MR. TOURAY'S PERSON AS A RESULT OF THAT BORDER SEARCH?

15  A.   YES, HE REPORTED A SPECIFIC AMOUNT, APPROXIMATELY I THINK

16  14,000 DOLLARS, AND CBP FOUND THAT HE HAD ABOUT 13 AND CHANGE

17  ON HIM.

18  Q.   WHAT DID YOU DO WITH THE CELLPHONE ONCE YOU RECEIVED IT?

19  A.   ONCE I RECEIVED THE CELLPHONE, I COULDN'T GET INTO IT

20  BECAUSE I DIDN'T HAVE THE PASSWORD, SO I WENT TO THE SUBJECT

21  AND USED HIS THUMBPRINT TO GET INTO IT SO I CAN GET THE MODEL

22  NUMBER SO I CAN MAKE SURE I HAVE THE RIGHT MODEL NUMBER ON THE

23  CHAIN OF CUSTODY.

24       I WENT THROUGH IT TO FIND THE MODEL NUMBER.  AS SOON

25  AS I DID THAT THE PHONE LOCKED UP ON ITS OWN, AND THEN ONCE THE

1  CHAIN OF CUSTODY WAS FILLED, I WENT TO THE SUBJECT AND

2  EXPLAINED TO HIM THAT THERE WAS AN INVESTIGATION GOING OUT OF

3  ATLANTA.  RIGHT NOW BECAUSE YOU'RE SUBJECT TO A BORDER SEARCH,

4  WE'RE GOING TO DETAIN YOUR PHONE FOR RIGHT NOW, AND I GAVE HIM

5  A COPY OF THE CHAIN OF CUSTODY AND SAID ON THIS CHAIN OF

6  CUSTODY IS A LIST OF THE AGENT'S NAME, YOU WANT TO CONTACT HIM,

7  HE'LL HAVE MORE INFORMATION ON WHAT'S GOING ON.

8  Q.   ALL RIGHT.  AND WHAT DO YOU DO WITH THE PHONE?

9  A.   I WENT BACK TO MY OFFICE.  I SECURED IT IN A LOCKED BOX AT

10 MY DESK, AND THEN THE NEXT DAY, I SENT IT FEDEX TO THE AGENT IN

11 ATLANTA.

12        MR. JOY:  MAY I HAVE ONE MOMENT, YOUR HONOR?

13        THE COURT:  OKAY.

14        (PAUSE IN THE PROCEEDINGS.)

15

16 BY MR. JOY:

17 Q.   HAD MR. TOURAY GIVEN ANY INDICATION THAT HE WAS

18 TRANSPORTING SOME MONEY ON BEHALF OF OTHER PEOPLE?

19 A.   FROM WHAT I WAS TOLD BY CBP, YES, THEY INFORMED ME THAT HE

20 WAS TRANSPORTING MONEY FOR OTHER PEOPLE.  I WASN'T REALLY PART

21 OF THE BORDER EXAMINATION SO I WASN'T THERE WHEN HE DESCRIBED

22 WHERE THE MONEY WAS GOING TO.  I JUST HEARD SECONDHAND FROM THE

23 CBP OFFICERS THAT HE WAS.

24        THEY DID PROVIDE A LIST OF NAMES THAT HE GAVE TO

25 THEM, AND THEN THEY GAVE IT TO ME.  THEN WHEN I SENT THE PHONE,

1   I SENT THAT ALONG, THAT PIECE OF PAPER ALONG WITH ALL THE NAMES

2   OF WHERE THE MONEY IS GOING TO GO ALONG WITH THE PHONE TO THE

3   AGENT IN ATLANTA.

4           MR. JOY:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

5           THE COURT:  OKAY.  YOUR WITNESS, MR. SAUL.

6           MR. SAUL:  YES, YOUR HONOR.

7                       CROSS-EXAMINATION

8   BY MR. SAUL:

9   Q.   DID YOU HAVE A WARRANT TO SEIZE THE PHONE?

10  A.   NO, WE DIDN'T.

11  Q.   DID YOU HAVE A WARRANT TO SEARCH THE PHONE?

12  A.   NO.

13  Q.   DID YOU USE SOMETHING CALLED CELLEBRITE?

14  A.   NO, I DIDN'T.

15  Q.   DID ANYONE FROM THE GOVERNMENT USE CELLEBRITE?

16  A.   I BELIEVE WHEN THE PHONE WAS SENT TO ATLANTA, THEY USED

17  CELLEBRITE.

18  Q.   YOU SAID THAT AN AGENT DEVANE, IS THAT FROM ATLANTA,

19  CALLED YOU?

20  A.   YES.

21  Q.   AND HE TOLD YOU TO LOOK INTO MR. TOURAY?

22  A.   HE SAID, HE TOLD ME HE HAD AN ONGOING INVESTIGATION, AND

23  HE REQUESTED THAT AN OUTBOUND EXAM BE SET UP, AND THAT WE

24  DETAIN THE PHONE IF ONE IS THERE.

25  Q.   AND MR. DEVANE TOLD YOU THAT HE WAS CONNECTED OR POSSIBLY

1 CONNECTED TO A MONEY LAUNDERING OPERATION?

2 A.   HE SAID AN ONGOING FINANCIAL INVESTIGATION, YES.

3 Q.   AND DID HE TELL YOU WHAT THE CONNECTION WAS?

4 A.   AT THE TIME HE DID.  IT'S BEEN TWO YEARS AGO SO I REALLY

5 DON'T KNOW WHAT IT WAS AT THE TIME, BUT HE DID BRIEF ME ON HIS

6 INVESTIGATION.

7 Q.   YOU CAN'T RECALL WHAT HE TOLD YOU?  MR. TOURAY IS NOW

8 UNDER INDICTMENT.

9 A.   IT WAS NOT MY INVESTIGATION.  MY RESPONSIBILITY WAS TO

10 OBTAIN THE PHONE ON HIS BEHALF SO --

11 Q.   WOULD IT BE IN YOUR NOTES?

12 A.   I DIDN'T TAKE ANY NOTES.

13 Q.   OFFICER DEVANE SAID THAT MR. TOURAY HAD BEEN STOPPED

14 PREVIOUSLY WITH A LARGE SUM OF MONEY ON HIM?

15 A.   YES.

16 Q.   AND THAT WAS WITHIN THE UNITED STATES?

17 A.   I BELIEVE SO.

18 Q.   WHILE HE WAS TRAVELING FROM ATLANTA TO LAS VEGAS?

19 A.   I DON'T KNOW THE EXACT DETAILS.  I DON'T KNOW.

20 Q.   BUT HE WAS TRAVELING INSIDE THE UNITED STATES --

21 A.   FROM MY KNOWLEDGE, YES.

22 Q.   -- WITH NO PLANS TO CROSS THE BORDER.  HE WAS INTRASTATE

23 TRAVEL -- I MEAN ALL THE TRAVEL WAS TO BE CONDUCTED IN THE

24 UNITED STATES BY MR. TOURAY?

25 A.   TO MY KNOWLEDGE, YES.

1  Q.   AND THE AGENTS FOUND APPROXIMATELY 60 OR SO THOUSAND

2  DOLLARS IN CASH OR A SUM OF CASH?

3  A.   I DON'T KNOW THE FULL DETAILS.

4  Q.   BUT YOU DID UNDERSTAND THAT THERE WAS SOME CASH FOUND?

5  A.   YES.

6  Q.   AND IT'S NOT AGAINST THE LAW TO HAVE CASH ON YOU?

7  A.   NO.

8  Q.   IT'S NOT AGAINST THE LAW TO HAVE MORE THAN 10,000 DOLLARS

9  IN CASH?

10 A.   NO.

11 Q.   AND IT'S NOT UNUSUAL IF SOMEBODY WAS GOING TO LAS VEGAS

12 THAT THEY WOULD BRING CASH TO LAS VEGAS?

13 A.   NO.

14 Q.   BUT YOU DON'T KNOW WHERE MR. TOURAY WAS GOING?

15 A.   DURING WHAT TIME?

16 Q.   WHEN HE WAS STOPPED EARLIER WITH THE MONEY ON HIM?

17 A.   NO, I DON'T.

18 Q.   YOU RECEIVED MR. TOURAY'S PHONE FROM SOME OTHER OFFICER?

19 A.   YES.

20 Q.   AND MR. TOURAY WOULD NOT GIVE YOU THE PASSCODE?

21 A.   HE GAVE US A PASSWORD THAT DIDN'T WORK, THAT HE DIDN'T

22 REMEMBER THE CORRECT PASSWORD.

23 Q.   YOUR NOTE SAYS TOURAY WOULD NOT PROVIDE CORRECT CODE?

24 A.   RIGHT.

25 Q.   THAT'S A TRUE STATEMENT?

1   A.   WHAT RECORD?

2           MR. SAUL:  MAY I APPROACH?

3           THE COURT:  YES, YOU MAY.

4   BY MR. SAUL:

5   Q.   IS THIS A COPY OF YOUR NOTES?

6   A.   YES, HE ADVISES 0719, THAT DIDN'T WORK, SO I ASKED HIM

7   WHAT THE CORRECT PASSWORD WAS, AND HE WOULD NOT PROVIDE IT.

8   Q.   I CAN'T READ THIS.  TOURAY WOULD NOT PROVIDE, WHAT'S THAT

9   WORD?

10  A.   ANOTHER --

11  Q.   ANOTHER CODE?

12  A.   ANOTHER CODE.

13  Q.   OKAY.  HE DIDN'T HAVE TO GIVE YOU A CODE?

14  A.   NO.

15  Q.   HE WAS UNDER NO OBLIGATION?

16  A.   NO.

17  Q.   AND MR. TOURAY, THE MONEY HE WAS TAKING OUT OF THE

18  COUNTRY, HE TOLD -- HE FILED THE CORRECT REPORT?

19  A.   WHEN HE MADE A CLAIM TO THE CBP OFFICER, YES, HE CLAIMED

20  THE RIGHT AMOUNT.

21  Q.   HE DID THAT PRIOR TO OFFICER COSTANZA STOPPING HIM?

22  A.   I BELIEVE SO, YES.

23  Q.   AND IT'S NOT AGAINST THE LAW TO BE TAKING MONEY OUT OF THE

24  COUNTRY TO BENEFIT OTHER PEOPLE?

25  A.   AS LONG AS YOU REPORT THE CORRECT AMOUNT OF MONEY, NO,

1  IT'S NOT ILLEGAL.

2  Q.   SO YOU CAN TAKE IT AND WRITE A LIST OF FRIENDS AND FAMILY

3  THAT YOU'RE GOING TO GIVE THE MONEY TO?

4  A.   YES.

5  Q.   SO THERE WAS NOTHING THAT MR. TOURAY WAS DOING TO YOUR

6  PERSONAL KNOWLEDGE THAT WAS SUSPICIOUS?

7  A.   NO.

8  Q.   I'M CORRECT, YES?

9  A.   YES.

10  Q.   AND YOU ALL DID NOT ARREST MR. TOURAY AT THE SCENE?

11  A.   NO.

12  Q.   AND TO YOUR KNOWLEDGE DID AGENTS EARLIER THAT FOUND A

13  LARGE SUM OF MONEY ON MR. TOURAY, THEY DID NOT ARREST HIM?

14  A.   TO MY KNOWLEDGE, NO, I DON'T THINK SO.

15  Q.   YOU SAID THAT MR. TOURAY TOUCHED THE PHONE WITH HIS THUMB?

16  A.   I BELIEVE SO.  HE HAD TO UNLOCK THE PHONE FOR ME TO GET

17  THE MODEL NUMBER.

18  Q.   AND DID THAT WORK?

19  A.   YES.

20          MR. SAUL:  THAT'S ALL.

21          THE COURT:  ANY ADDITIONAL QUESTIONS OF THIS WITNESS,

22  MR. JOY?

23          MR. JOY:  NO, YOUR HONOR.

24          THE COURT:  YOU MAY STEP DOWN.

25          ANY ADDITIONAL WITNESSES, MR. JOY?

1          MR. JOY:  YES, YOUR HONOR, THE GOVERNMENT CALLS

2    SPECIAL AGENT MATTHEW DEVANE.

3          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

4    OATH.

5                          MATTHEW DEVANE,

6    HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

7          THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

8    STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

9    ALSO.

10          THE WITNESS:  MATTHEW DEVANE.  IT'S SPELLED

11    D E CAPITAL V AS IN VICTOR A N E.

12          THE COURT:  YOU MAY PROCEED, MR. JOY.

13          MR. JOY:  THANK YOU, YOUR HONOR.

14                          DIRECT EXAMINATION

15    BY MR. JOY:

16    Q.   SPECIAL AGENT DEVANE, WHERE DO YOU WORK?

17    A.   I CURRENTLY WORK FOR THE U.S. DEPARTMENT OF TRANSPORTATION

18    OFFICE OF THE INSPECTOR GENERAL OFFICE OF INVESTIGATIONS.

19    Q.   DID YOU PREVIOUSLY WORK FOR HOMELAND SECURITY

20    INVESTIGATIONS?

21    A.   I DID.

22    Q.   WHEN DID YOU MAKE THAT SWITCH?

23    A.   MARCH OF THIS YEAR, MARCH 2021.

24    Q.   HOW LONG DID YOU WORK AT HSI?

25    A.   FROM DECEMBER OF 2008 TO MARCH OF 21, SO A LITTLE OVER 12

1  YEARS.

2  Q.    AND DID YOU HAVE ANY LAW ENFORCEMENT EXPERIENCE PRIOR TO

3  THAT?

4  A.    YES, I WAS A POLICE OFFICER WITH THE COBB COUNTY POLICE

5  DEPARTMENT HERE IN METRO ATLANTA.

6  Q.    OKAY.  WERE YOU INVOLVED IN THE INVESTIGATION OF THIS

7  CASE?

8  A.    I WAS.

9  Q.    WHAT WAS YOUR ROLE?

10  A.    I WAS THE PRIMARY CASE AGENT.

11  Q.    ON MAY 12TH, 2019 DID YOU REACH OUT TO SPECIAL AGENT

12  SYMONDS TO REQUEST A BORDER SEARCH OF THE DEFENDANT MR.

13  BANGALLY TOURAY?

14  A.    I DID.

15  Q.    CAN YOU TELL US A LITTLE BIT ABOUT HOW THAT CAME TO PASS?

16  A.    MR. TOURAY HAD BEEN IDENTIFIED IN AN ONGOING INVESTIGATION

17  BY HSI AND OTHER FEDERAL AND STATE AGENCIES HERE IN ATLANTA AND

18  ACROSS THE UNITED STATES.

19         HE HAD BEEN PREVIOUSLY ENCOUNTERED AT

20  HARTSFIELD-JACKSON ATLANTA INTERNATIONAL AIRPORT IN POSSESSION

21  OF JUST OVER 60,000 DOLLARS THAT HE WAS TAKING ON A FLIGHT FROM

22  ATLANTA TO PHOENIX, PHOENIX TO RENO.  THEN HE INDICATED THAT

23  SOME OF THAT MONEY WAS THE PROPERTY OF AN INDIVIDUAL NAMED

24  ALHAJI WHO IS -- ALHAJI TOURAY WHO IS BELIEVED TO BE THE LEADER

25  OF A DRUG TRAFFICKING AND MONEY LAUNDERING ORGANIZATION THAT'S

1 THE SUBJECT OF THIS CASE.

2 Q.   ALL RIGHT.  WHEN YOU REACHED OUT TO SPECIAL AGENT SYMONDS,

3 DID YOU GIVE HIM ANY INFORMATION REGARDING THIS INVESTIGATION?

4 A.   I DID.

5 Q.   DID YOU TELL HIM THAT MR. TOURAY HAD PREVIOUSLY HAD

6 APPROXIMATELY 66,000 DOLLARS SEIZED FROM HIM AS YOU DESCRIBED A

7 MINUTE AGO?

8 A.   I DID.  I THINK IT MAY HAVE BEEN 60,060 DOLLARS, BUT IF I

9 COULD SEE MY REPORT TO REFRESH, BUT IT WAS JUST OVER 60,000

10 DOLLARS I BELIEVE.  I COULD BE MISTAKEN, BUT I'D HAVE TO LOOK

11 AT THE REPORT.

12          MR. JOY:  YOUR HONOR, MAY I APPROACH?

13          THE COURT:  YES, YOU MAY.

14          THE WITNESS:  SO MY MISTAKE, IT WAS 66,060 DOLLARS

15 WAS THE INITIAL SEIZURE.

16 BY MR. JOY:

17 Q.   AND TO YOUR UNDERSTANDING WAS A BORDER SEARCH PERFORMED ON

18 MR. TOURAY?

19 A.   YES.

20 Q.   AND WHERE WAS YOUR -- DID YOU KNOW WHERE MR. TOURAY WAS

21 TRAVELING?

22 A.   I REMEMBER IT BEING INTERNATIONAL.  I DON'T RECALL THE

23 DESTINATION OTHER THAN THE FINAL DESTINATION WAS IN GAMBIA.

24 Q.   AND DO YOU KNOW IF A CELLPHONE WAS OBTAINED FROM MR.

25 TOURAY IN THE COURSE OF THAT BORDER SEARCH?

1  A.  THAT'S MY UNDERSTANDING.

2  Q.  AT SOME POINT DID YOU RECEIVE THE CELLPHONE?

3  A.  YES, IT WAS TRANSFERRED FROM SPECIAL AGENT DAN SYMONDS AT

4  JFK WITH HSI, AND IT WAS TRANSFERRED TO ME VIA FEDEX HERE IN

5  ATLANTA.

6  Q.  WHAT HAPPENED ONCE SPECIAL AGENT SYMONDS SENT THIS PHONE

7  TO YOU HERE IN ATLANTA?

8  A.  I TOOK POSSESSION OF THE PHONE AND TURNED IT ON ON MAY 15

9  AND ATTEMPTED TO USE THE PASSCODE THAT WAS PROVIDED BUT DID NOT

10  WORK.  I ATTEMPTED TO USE A CELLEBRITE, CELLEBRITE SOFTWARE TO

11  OPEN THE PHONE AND BYPASS THE PASSCODE WHICH DID NOT WORK ON

12  THE 15TH, BUT DID WORK THE FOLLOWING DAY ON THE 16TH.

13  Q.  WERE YOU ABLE TO SEARCH THE PHONE USING CELLEBRITE?

14  A.  I WAS.

15  Q.  WITHOUT GOING INTO DETAIL ABOUT EVERYTHING THAT WAS ON THE

16  PHONE, TO YOUR BELIEF WAS THERE DATA ON THE PHONE THAT WAS

17  RELEVANT TO THIS INVESTIGATION?

18  A.  YES.

19  Q.  IS IT A COMMON PRACTICE FOR A CELLPHONE SEIZED AT JFK TO

20  BE SEARCHED IN ATLANTA?

21  A.  YOU SAID DETAINED DURING A BORDER SEARCH?  IT'S VERY

22  COMMON THAT JFK AND OTHER INTERNATIONAL AIRPORTS WHERE HSI

23  AGENTS WORK THAT THEY WILL DETAIN ELECTRONIC DEVICES FROM

24  TRAVELERS, AND THEN THEY WILL PROVIDE THEM BY OVERNIGHT FEDEX

25  OR SOME OTHER SHIPPING METHOD TO AN AGENT SOMEWHERE ELSE WITH

1  EITHER GREATER TECHNOLOGICAL EXPERTISE OR INVESTIGATIVE

2  EXPERTISE IN WHATEVER BORDER RELATED ISSUE THAT A PHONE IS

3  INVOLVED IN, SO IT'S FAIRLY COMMON.

4  Q.   AND WOULD YOU SAY THAT YOU'VE HAD GREATER INVESTIGATIVE

5  EXPERTISE AS IT PERTAINS TO THIS INVESTIGATION THAN THE AGENTS

6  IN NEW YORK WOULD HAVE HAD?

7  A.   I WOULD.

8  Q.   ARE YOU AWARE OF WHETHER ANY MONEY WAS FOUND ON MR. TOURAY

9  IN THE COURSE OF THIS BORDER SEARCH?

10  A.   YES, I WAS TOLD IT WAS APPROXIMATELY 14,000 DOLLARS.

11  Q.   AND ARE YOU AWARE WHETHER MR. TOURAY GAVE INFORMATION

12  REGARDING OTHER PEOPLE WHO YOU SAID THIS MONEY BELONGED TO?

13  A.   I WAS PROVIDED A FORM 909 THAT CBP OFTENTIMES USES TO BOTH

14  ADVISE TRAVELERS OF THEIR RESPONSIBILITY TO REPORT CURRENCY

15  UNDER CURRENCY AND MONETARY INSTRUMENT REPORTING REQUIREMENTS,

16  AND THEN ON THE BACK OF THAT FORM WAS A SERIES OF NAMES AND

17  THEN DOLLAR AMOUNTS LISTED NEXT TO THEM, AND I WAS INFORMED

18  THAT THESE WERE THE NAMES FROM WHICH MR. TOURAY, MR. BANGALLY

19  TOURAY WAS CARRYING CURRENCY.

20         THE TOP NAME ON THE LIST WHILE MISSPELLED FOR THE

21  ACTUAL, I BELIEVE THE ACTUAL SPELLING OF ALHAJI'S NAME MEANING

22  ALHAJI TOURAY, THERE WAS A SPELLING THAT APPEARED TO BE

23  PHONETICALLY ALHAJI WHO WOULD BE THE PRIMARY TARGET OF OUR

24  INVESTIGATION WHO AT THE TIME WAS OPERATING AN UNLICENSED MONEY

25  SERVICES BUSINESS FINANCE AND BELIEVED TO BE INVOLVED IN DRUG

1 MONEY LAUNDERING.

2 Q.   ALL RIGHT.  EVEN IF AN INDIVIDUAL DECLARES MONEY THAT

3 THEY'RE TAKING OUTSIDE THE UNITED STATES, ARE THERE FEDERAL

4 OFFENSES THAT AN INDIVIDUAL COULD BE COMMITTING IF THEY HAVE

5 LARGE QUANTITIES OF U.S. CURRENCY ON THEM?

6 A.   CERTAINLY.  THE MONEY COULD BE CRIMINALLY DERIVED FROM

7 EITHER FRAUD, DRUG SALES OR ANY NUMBER OF OTHER SCHEMES, AND IN

8 ORDER TO AVOID YET ANOTHER CRIMINAL VIOLATION, SOMEONE COULD

9 DECLARE THAT CURRENCY.

10         THERE ARE ALSO MONEY LAUNDERING SCHEMES WHERE PEOPLE

11 WILL OVER OR UNDER DECLARE CURRENCY COMING INTO THE UNITED

12 STATES IN ORDER TO CONCEAL THE TRUE AMOUNT OF CURRENCY FROM THE

13 FEDERAL GOVERNMENT.

14         SO EVEN THOUGH SOMEONE DECLARES IT, IT DOES NOT MEAN

15 THAT IT WASN'T CRIMINALLY DERIVED, OR THERE WASN'T SOME OTHER

16 CRIMINAL ACTIVITY THAT WAS GOING ON.

17 Q.   OKAY.  BASED ON YOUR TRAINING AND EXPERIENCE DID YOU HAVE

18 ANY REASON TO BELIEVE THAT THE SEARCH OF MR. TOURAY'S CELLPHONE

19 WAS UNLAWFUL?

20 A.   NO.

21 Q.   THE 66,000 DOLLARS THAT WAS PREVIOUSLY SEIZED FROM MR.

22 TOURAY, DID YOU HAVE ANY BELIEF AT THE TIME THAT THAT MONEY

23 COULD POSSIBLY HAVE BEEN INVOLVED IN MONEY LAUNDERING?

24 A.   YES, SIR, BASED ON HOW IT WAS PACKAGED WITHIN THE

25 SUITCASES AND THE SIMILAR TRAVEL DESTINATIONS, THE FAMILIAL

1 RELATIONSHIP TO SUSPECTED DRUG TRAFFICKERS, WE SUSPECTED IT WAS

2 INVOLVED IN MONEY LAUNDERING.  THAT'S WHY IT WAS SEIZED.

3          MR. JOY:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

4          THE COURT:  OKAY.  YOUR WITNESS, MR. SAUL.

5          MR. SAUL:  YES.  CAN I HAVE ONE MOMENT PLEASE?

6          THE COURT:  SURE.

7          (PAUSE IN THE PROCEEDINGS.)

8          MR. SAUL:  MAY I PROCEED, YOUR HONOR?

9          THE COURT:  YES, YOU MAY.

10                    CROSS-EXAMINATION

11 BY MR. SAUL:

12 Q.   JUST TO CLEAR UP SOMETHING, WHEN THE AGENTS IN I BELIEVE

13 IT WAS MARCH STOPPED MR. TOURAY, WAS THAT IN PHOENIX OR RENO?

14 A.   IN ATLANTA.

15 Q.   IT WAS IN ATLANTA?

16 A.   YES, SIR.

17 Q.   SO HE HAD NOT LEFT ATLANTA TO GO TO PHOENIX?

18 A.   CORRECT.

19 Q.   AND THE TICKET WAS ATLANTA TO PHOENIX, PHOENIX TO RENO?

20 A.   I BELIEVE SO, SIR.

21 Q.   AND MR. TOURAY SAID HE WAS TAKING -- YOU ALL FOUND 66,000

22 DOLLARS OR APPROXIMATELY IN HIS BAG, AND HE SAID THAT HE WAS

23 TAKING IT TO GAMBLE TO MAKE MORE MONEY OUT OF IT?

24 A.   THAT HE WAS TAKING SOME MONEY FOR ALHAJI, AND THAT HE WAS

25 GOING TO FLIP IT MULTIPLE TIMES AND EARN AS AN INVESTMENT

1 STRATEGY EARN MORE MONEY FROM THE AMOUNT OF MONEY THAT HE SAID

2 WAS FROM ALHAJI.

3 Q.   AND WHAT IS THE RELATIONSHIP BETWEEN MR. BANGALLY TOURAY

4 AND ALHAJI TOURAY?

5 A.   I DON'T KNOW SPECIFICALLY.

6 Q.   ARE THEY RELATED?

7 A.   I BELIEVE THAT'S WHAT I'VE BEEN TOLD BY SOURCES ALONG THE

8 WAY, BUT I HAVE NEVER HAD ANYONE -- WE'VE DONE OUR BEST TO

9 CREATE A FAMILY TREE, BUT MR. ALHAJI TOURAY HAS -- I'D HAVE TO

10 LOOK BACK AT MY NOTES BUT SOMEWHERE AROUND 30 OR 40 BROTHERS

11 AND SISTERS, SO IT'S DIFFICULT FOR US TO DETERMINE EXACTLY THE

12 FAMILY RELATIONSHIP, AND I'VE NEVER HAD ANYONE DESCRIBE IT TO

13 ME EXACTLY, AND OFTENTIMES IT'S COMMONPLACE FOR PEOPLE TO SAY

14 THIS PERSON MAY BE MY COUSIN OR THIS IS MY BROTHER WHEN IN

15 ACTUALITY IT'S JUST A CLOSE TIE TO SOMEONE AND NOT NECESSARILY

16 A BLOOD RELATIVE.

17 Q.   WHEN YOU ALL STOPPED HIM IN ATLANTA, YOU DID NOT ARREST

18 HIM?

19 A.   WHEN THE ATLANTA POLICE DEPARTMENT STOPPED HIM, THEY DID

20 NOT ARREST HIM.

21 Q.   DID THE POLICE CALL YOU?

22 A.   I WAS THERE WITH THEM.

23 Q.   SO THERE WAS NO ARREST --

24 A.   CORRECT.

25 Q.   -- AND THE MONEY WAS -- YOU ALL TOOK, THE GOVERNMENT TOOK

1  THE MONEY?

2  A.   YES, SIR.

3  Q.   THE MONEY THAT WAS FOUND IN NEW YORK AT JFK, THE 14,000,

4  MR. TOURAY DISCLOSED THAT BEFORE ANY ENCOUNTERS WITH YOUR

5  AGENTS?

6  A.   THAT'S MY UNDERSTANDING.

7  Q.   AND YOU DON'T KNOW WHERE THAT MONEY CAME FROM?

8  A.   I DO NOT OTHER THAN THE LIST OF NAMES THAT HE PROVIDED

9  INDICATING THE PEOPLE THAT IT CAME FROM, BUT WHERE IT WAS

10 EARNED FROM, I DON'T HAVE ANY RECORDS TO SHOW THAT.

11 Q.   NOW WAS THE LIST -- DID HE SAY IT WAS EARNED FROM THOSE

12 PEOPLE, OR WAS THAT YOUR INTERPRETATION?

13 A.   I WAS TOLD IT WAS PROVIDED BY THOSE, THAT HE WAS CARRYING

14 IT FOR THOSE PEOPLE.

15 Q.   AND WHO TOLD YOU THAT?

16 A.   IT WAS ON THE 909, AND IT WOULD HAVE BEEN COMMUNICATED BY

17 THE TELEPHONE CALL OR OTHERWISE.

18 Q.   HE WASN'T INDICATING THAT HE WAS DELIVERING THAT TO PEOPLE

19 IN GAMBIA?

20 A.   IT WOULD BE DELIVERED TO PEOPLE IN GAMBIA, YES, SIR.

21 Q.   YOU TOLD AGENT SYMONDS THAT MR. BANGALLY TOURAY HAD SOME

22 CONNECTION TO THIS GROUP THAT YOU ALL WERE INVESTIGATING?

23 A.   YES, SIR.

24 Q.   AND YOU TOLD HIM THAT HE WAS A BLOOD RELATIVE?

25 A.   I CAN'T REMEMBER EXACTLY, OTHER THAN WE BELIEVE THERE'S

1 SOME FAMILIAL RELATIONSHIP.

2 Q.    OKAY.  SO THERE WAS SOME FAMILY RELATIONSHIP, AND YOU TOLD

3 HIM THAT HE HAD 60 SOMETHING THOUSAND DOLLARS WITH HIM WHEN HE

4 WAS STOPPED IN ATLANTA?

5 A.    HE WOULD HAVE BEEN MADE AWARE OF THAT, YES.

6 Q.    AND IT'S NOT AGAINST THE LAW TO HAVE 66,000 DOLLARS IN

7 CASH?

8 A.    NO, SIR, JUST HAVING THE CASH IS NOT AGAINST THE LAW.

9 Q.    WHAT OTHER CONNECTION DID MR. BANGALLY TOURAY HAVE THAT

10 YOU TOLD AGENT SYMONDS?

11 A.    I DON'T RECALL.

12 Q.    SO THE ONLY THING YOU CAN REMEMBER TODAY IS THAT YOU TOLD

13 AGENT SYMONDS THERE'S A FAMILY RELATIONSHIP AND THAT MR.

14 BANGALLY TOURAY HAD A LARGE SUM OF MONEY ON HIM ON A PREVIOUS

15 OCCASION?

16 A.    THAT HE STATED HE WAS CARRYING THAT MONEY FROM THE PRIMARY

17 TARGET OF OUR INVESTIGATION OR THE INDIVIDUAL BELIEVED TO BE

18 THE PRIMARY TARGET OF OUR INVESTIGATION WHO HAS NOW BEEN

19 INDICTED ON THIS CASE.

20 Q.    MR. BANGALLY TOURAY HAS NEVER MADE ANY ADMISSION REGARDING

21 MONEY LAUNDERING?

22 A.    AT ANY POINT?

23 Q.    WELL, AT THIS TIME DURING ANY STOP OR ENCOUNTER AT JFK OR

24 ATLANTA?

25 A.    I MEAN HE DIDN'T SPECIFICALLY READ THE CODE SECTION TO ME,

```
 1   BUT TO INDICATE THAT HE WAS CARRYING MONEY FOR AN INDIVIDUAL,
 2   IF YOU'RE TALKING ABOUT THE MARCH 19 INCIDENT, IF HE INDICATED
 3   THAT HE WAS CARRYING MONEY ACROSS THE COUNTRY FOR AN INDIVIDUAL
 4   WHO WE BELIEVED AT THE TIME AND HAVE ALLEGED IN INDICTMENTS WAS
 5   DERIVED FROM DRUG PROCEEDS THAT WOULD BE ACTIVITY CONSISTENT
 6   WITH MONEY LAUNDERING THOUGH HE DIDN'T USE THE TERM MONEY
 7   LAUNDERING.
 8   Q.   ONE OF THE OTHER OFFICERS TESTIFIED THAT THEY DID NOT HAVE
 9   A WARRANT WHEN THEY TOOK POSSESSION OF THE CELLPHONE.  DID YOU
10   EVER OBTAIN A WARRANT TO POSSESS THE CELLPHONE?
11   A.   NO, SIR.
12   Q.   DID YOU EVER -- AND THE PHONE CAME TO ATLANTA --
13   A.   YES, SIR.
14   Q.   -- BY FEDERAL EXPRESS?
15   A.   YES, SIR.
16   Q.   OFFICER SYMONDS SENT IT TO YOU?
17   A.   YES, SIR.
18   Q.   AND IT CAME TO YOUR OFFICE WHEREVER THAT MIGHT BE?
19   A.   YES, SIR.
20   Q.   AND DID YOU COME TO FEDERAL COURT OR ANY JUDGE AND ASK FOR
21   A WARRANT TO SEARCH FURTHER?
22   A.   NO, SIR.
23   Q.   YOU JUST DECIDED TO USE, WHAT'S IT CALLED CELLEBRITE?
24   A.   I DECIDED TO UTILIZE MY BORDER SEARCH AUTHORITY AND
25   UTILIZE A CELLEBRITE TO OPEN THE PHONE.
```

1 Q.    AND THE PHONE WAS NOT NEAR THE BORDER WHEN YOU ALL

2 SEARCHED IT?

3 A.    SIR, THERE ARE THREE DIFFERENT TYPES OF BORDER.  THERE'S

4 THE ACTUAL BORDER WHICH YOU'RE FAMILIAR WITH LIKE EL PASO

5 ACTUALLY TOUCHES MEXICO, SO THAT WOULD BE A DISTINCT LINE DRAWN

6 IN THE SAND THAT THIS IS WHERE THE BORDER IS.

7         AND THEN THERE WOULD BE A FUNCTIONAL EQUIVALENT OF

8 THE BORDER WHICH WOULD BE A SITUATION LIKE HERE IN ATLANTA

9 WHERE A DELTA AIR LINES PLANE MAY TRAVEL FROM MEXICO CITY AND

10 INSTEAD OF STOPPING IN EL PASO WHERE IT CROSSED THE ACTUAL

11 BORDER, THERE WOULD BE AN AGREEMENT WITH THE UNITED STATES

12 GOVERNMENT WHERE THEY COULD STOP THE FUNCTIONAL EQUIVALENT OF

13 THE BORDER, IN THIS CASE ATLANTA, GEORGIA, WHERE THEY COULD

14 SUBMIT THEIR PASSENGERS AND THEIR CREW AND THEIR AIRCRAFT AND

15 ANY COMMERCE THAT THEY'RE BRINGING TO THE UNITED STATES, THEY

16 COULD SUBMIT FOR A SEARCH HERE IN ATLANTA AS THE FUNCTIONAL

17 EQUIVALENT OF THE BORDER.

18         SO WHILE A JET BRIDGE IN ATLANTA MAY BE AMERICAN

19 SOIL, WHEN A PLANE ARRIVING FROM MEXICO DOCKS AT THAT JET

20 BRIDGE IT BECOMES THE BORDER WHERE ANYONE INTERACTING AND

21 HAVING A MEANINGFUL INTERACTION WITH INTERNATIONAL COMMERCE

22 WOULD BE SUBJECT TO SEARCH.

23         AND THEN YOU'VE GOT THE EXTENDED BORDER.  SO UNDER

24 CUSTOMS LAW WE'RE ABLE TO EXTEND THE BORDER IF THERE'S NO

25 MEANINGFUL CHANGE BETWEEN COMMERCE WHEN IT ENTERS THE UNITED

1  STATES AND WHEN IT TRAVELS TO ANOTHER PLACE WITHIN THE UNITED

2  STATES WE CAN EXTEND THE BORDER TO THAT LOCATION.

3  Q.   TO THE BEST OF YOUR KNOWLEDGE THE CELLPHONE NEVER CROSSED

4  THE BORDER?

5  A.   IT NEVER CROSSED THE BORDER BUT IT ATTEMPTED TO CROSS THE

6  BORDER MEANING UNDER CUSTOMS LAW AS I HAVE BEEN TRAINED WHEN AN

7  INDIVIDUAL OR AN ITEM PASSES THE LAST MOMENT OF INTENT SHOWING

8  THAT THEY'RE GOING TO DEPART THE UNITED STATES THAT IS WHEN A

9  BORDER SEARCH COMES INTO EFFECT.

10          SO SIMPLY BEING IN A GATE AREA MAY NOT TRIGGER A

11  BORDER SEARCH, BUT AS HAS BEEN TRAINED TO ME WHEN SOMEONE

12  PRESENTS A BOARDING PASS AND ENTERS INTO A SECURE AREA WHERE

13  THE ONLY PLACE THEY COULD GO IS ONTO AN AIRCRAFT THAT BY OUR

14  RECORDS AND BY AIRLINE RECORDS INTENDING TO DEPART THE UNITED

15  STATES, THEN THAT PERSON SUBJECTS THEMSELVES TO BORDER SEARCH.

16  A BORDER SEARCH IS TRIGGERED AT THAT POINT WHERE THEY ATTEMPT

17  TO EXIT THE UNITED STATES.

18  Q.   JUST TO BE CLEAR AND I'M SURE EVERYBODY IS CLEAR ON THIS,

19  MR. TOURAY WAS LEAVING THE UNITED STATES?

20  A.   YES, THAT'S MY UNDERSTANDING.

21  Q.   YOU ALL DID NOT STOP HIM UPON ENTERING THE UNITED STATES?

22  A.   CORRECT.

23  Q.   WHEN HE WAS IN ATLANTA DID YOU ALL CHECK AND SEE IF HE HAD

24  A HOTEL ROOM OR ANYTHING OF THAT NATURE IN RENO?

25  A.   DID WE CHECK OTHER THAN ASKING?  I DON'T KNOW IF HE WAS

1  ASKED, AND IT WOULD BE IMPOSSIBLE FOR US TO CHECK WITH EVERY

2  HOTEL.

3  Q.    SPECIFICALLY WHAT WERE YOU LOOKING FOR ON THAT PHONE?

4  A.    ON THE PHONE FROM MAY 19TH?

5  Q.    YES.

6  A.    SO THE INVESTIGATION IS A MONEY LAUNDERING AND UNLICENSED

7  MONEY REMITTING CASE, WE HAD AN INDIVIDUAL IN THIS CASE WHO

8  ATTEMPTED TO DEPART THE UNITED STATES WITH ABOUT 18,000 DOLLARS

9  THAT WAS CONCEALED WITHIN HIS SUITCASE, AND IT WAS DEPARTING

10  THE UNITED STATES, SO THE ORGANIZATION WAS BOTH A DOMESTIC AND

11  INTERNATIONAL MONEY LAUNDERING AND UNLICENSED MONEY SERVICES

12  BUSINESS.

13          SO WITHIN THE PHONE I WAS CERTAINLY LOOKING FOR ANY

14  RECORDS THAT WOULD SHOW THAT THIS INTERNATIONAL MONEY SERVICES,

15  ILLEGAL MONEY SERVICES BUSINESS WAS OPERATING USING A UNITED

16  STATES BORDER AND TAKING MONEY OUTSIDE OF THE UNITED STATES

17  BORDER WHICH IF IT WAS CRIMINALLY DERIVED WOULD ALSO BE

18  REPRESENTED UNDER MONEY LAUNDERING STATUTES FOR TAKING THE

19  MONEY OUTSIDE THE UNITED STATES WITHOUT REPORTING IT OR AGAINST

20  OTHER LAWS.

21          BUT IN ADDITION MY UNDERSTANDING OF OUR BORDER SEARCH

22  AUTHORITY IS TO LOOK NOT ONLY FOR ONE THING BUT FOR MANY

23  THINGS, THAT THE INTEREST OF THE GOVERNMENT IS TO PREVENT THE

24  EXPORT OF CHILD PORNOGRAPHY AND EVERYTHING ELSE.  SO ANYTHING

25  RELATED TO COMMERCE AND EFFECTING COMMERCE OF THE UNITED STATES

1   IS WHAT I WAS SEARCHING FOR.

2   Q.   SO YOU WERE LOOKING FOR ANYTHING THAT MIGHT SHOW ANY KIND

3   OF UNLAWFUL ACTIVITY, AND YOU USED THE EXAMPLE OF PORNOGRAPHY?

4   A.   RIGHT, SO IT'S ANYTHING THAT IS AFFECTING THE BORDER AND

5   COMMERCE OF THE UNITED STATES OF AMERICA EXITING THE UNITED

6   STATES.

7          MR. SAUL:  THAT'S ALL, YOUR HONOR.

8          THE COURT:  ANY REDIRECT OF THIS WITNESS, MR. JOY?

9          MR. JOY:  YES, YOUR HONOR.

10                    REDIRECT EXAMINATION

11  BY MR. JOY:

12  Q.   ALONG THE LINES OF THE LAST SET OF QUESTIONING, WOULD

13  EVIDENCE OF DRUG SALES POTENTIALLY BE OR DRUG TRANSACTIONS

14  POTENTIALLY BE RELEVANT TO MONEY LAUNDERING?

15  A.   YES.

16  Q.   COULD IT ALSO BE RELEVANT TO COMMERCE?

17  A.   YES.

18  Q.   WITHOUT GOING INTO FURTHER DETAILS, IS IT FAIR TO SAY THAT

19  THERE'S MORE EVIDENCE THAT'S BEEN UNCOVERED IN THE COURSE OF

20  YOUR INVESTIGATION REGARDING MR. BANGALLY TOURAY AND THE

21  CHARGES IN THIS CASE THAN SIMPLY WHAT YOU'VE TESTIFIED TO

22  TODAY?

23  A.   YES.

24          MR. JOY:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

25          THE COURT:  ANYTHING ELSE, MR. SAUL?

1            MR. SAUL:  NO, YOUR HONOR.

2            THE COURT:  OKAY.  YOU MAY STEP DOWN.  DOES THE

3  GOVERNMENT HAVE ANY OTHER WITNESSES?

4            MR. JOY:  THE GOVERNMENT HAS NO FURTHER WITNESSES,

5  YOUR HONOR.

6            THE COURT:  MR. SAUL, ANY WITNESSES?

7            MR. SAUL:  NO, YOUR HONOR.

8            THE COURT:  WE SHOULD HAVE A TRANSCRIPT BY MAY 24TH,

9  AND THEN I WILL GIVE THE -- DO YOU HAVE ANY TRIALS SCHEDULED,

10 MR. SAUL, FOR ME TO CONSIDER BEFORE SETTING YOUR BRIEFING

11 SCHEDULE?

12           MR. SAUL:  WE HAVE A TRIAL SCHEDULED JUNE THE 14TH.

13           THE COURT:  HOW LONG IS YOUR TRIAL?

14           MR. SAUL:  HOW LONG WILL IT BE?

15           THE COURT:  YES.

16           MR. SAUL:  THE GOVERNMENT ANNOUNCED THREE DAYS SO IT

17 WILL PROBABLY BE LONGER.

18           THE COURT:  SO THE 28TH OF JUNE WILL GIVE YOU ENOUGH

19 TIME TO HAVE YOUR TRIAL IF IT GOES OVER --

20           MR. SAUL:  YES, YOUR HONOR.

21           THE COURT:  -- AND TO DO ANY POST-TRIAL.  SO THE 28TH

22 OF JUNE --

23           MR. SAUL:  YES.

24           THE COURT:  -- FOR YOUR PERFECTED MOTION TO

25 SUPPRESS.  SAME QUESTION, MR. JOY.

1          MR. JOY:  SO I NOW THAT I'VE GOT A TRIAL THAT'S

2    FLOATING AROUND AND LIKELY TO BE SET IN JUNE.  I DON'T KNOW

3    SPECIFICALLY WHEN IT'S GOING TO BE.  IT WILL BE ON JUDGE

4    THRASH'S NEXT TRIAL CALENDAR, I BELIEVE, BUT OTHER THAN THAT I

5    DON'T BELIEVE THAT ANY HAVE BEEN SET YET.

6          THE COURT:  I'LL GIVE YOU UNTIL JULY 23RD TO RESPOND,

7    AND THEN TO FILE YOUR RESPONSE TO THE DEFENDANT'S BRIEF.

8          MR. JOY:  YOUR HONOR, I THINK THAT I ACTUALLY JUST

9    GOT SET ON FRIDAY TO FILE A RESPONSE BRIEF FOR ANOTHER

10   EVIDENTIARY HEARING THAT SAME WEEK.  IS IT POSSIBLE TO GET ONE

11   ADDITIONAL WEEK?

12         THE COURT:  SURE, JULY 30TH.

13         MR. JOY:  YES, THAT SHOULD BE GREAT, YOUR HONOR.

14         THE COURT:  AND THEN I WILL GIVE THE DEFENSE UNTIL

15   AUGUST 16TH TO FILE A REPLY.

16         ANYTHING ELSE ON BEHALF OF EITHER PARTY?

17         MR. SAUL:  NO, YOUR HONOR.

18         MR. JOY:  NOT FROM THE GOVERNMENT, YOUR HONOR.

19         THE COURT:  NOTHING ELSE IN FRONT OF THE COURT, COURT

20   IS IN RECESS.

21          (PROCEEDINGS CONCLUDED.)

22

23

24

25

1                          INDEX

2

3  JOHN A. COSTANZA
   DIRECT EXAMINATION
4  BY MR. JOY:.................................................. 3
   CROSS-EXAMINATION
5  BY MR. SAUL: ............................................... 8
   REDIRECT EXAMINATION
6  BY MR. JOY:................................................ 12
   RECROSS-EXAMINATION
7  BY MR. SAUL: .............................................. 13

8  DANIEL P. SYMONDS
   DIRECT EXAMINATION
9  BY MR. JOY: ............................................... 15
   CROSS-EXAMINATION
10 BY MR. SAUL: .............................................. 19

11 MATTHEW DEVANE
   DIRECT EXAMINATION
12 BY MR. JOY:............................................... 24
   CROSS-EXAMINATION
13 BY MR. SAUL: .............................................. 30
   REDIRECT EXAMINATION
14 BY MR. JOY: ............................................... 38

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    C-E-R-T-I-F-I-C-A-T-E
 3
 4  UNITED STATES OF AMERICA
 5  NORTHERN DISTRICT OF GEORGIA
 6
 7          I, ANDRE G. ASHLEY, DO HEREBY CERTIFY THAT I AM A
 8  U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA,
 9  THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND
10  ACCURATE TRANSCRIPTION OF MY MACHINE SHORTHAND NOTES AS TAKEN
11  AFORESAID.
12          IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON
13      THIS 12TH DAY OF MAY, 2021.
14
15
16
17
18
19                              ANDRE G. ASHLEY
                                OFFICIAL COURT REPORTER
20                              NORTHERN DISTRICT OF GEORGIA
21
22
23
24
25
```