IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

BANGALLY TOURAY,

      Defendant.

CRIMINAL ACTION NO.
1:20-CR-00103-TWT-LTW-5

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is before the Court on Defendant Bangally Touray's ("Defendant") Motions to Suppress Search of His Home and Post-Arrest Statements.  [Docs. 222, 223].[1]  On August 2, 2022, the undersigned held an evidentiary hearing regarding the motions to suppress.  [Doc. 254].  After the hearing, Defendant filed a Post-Hearing Brief in Support of His Motions to Suppress ([Doc. 256]), and the Government responded ([Doc. 257]).  On November 7, 2022, Defendant filed a reply to the Government's response brief.  [Doc. 259].  For the reasons discussed below, the undersigned **RECOMMENDS** that the Motions be **DENIED**.  [Docs. 222, 223].

## BACKGROUND

---

[1] Defendant also filed a Motion to Suppress Evidence based on the Government's belated disclosure of certain evidence. [Docs. 221]. That motion has been **DENIED as moot**. [Doc. 255 at 90].

On September 2, 2020, six defendants were charged in a Superseding Indictment containing six counts: a money laundering conspiracy in violation of 18 U.S.C. § 1956; illegal re-entry in violation of 8 U.S.C. § 1326; a marijuana trafficking conspiracy in violation of 21 U.S.C. § 846; a substantive marijuana possession with intent to distribute count in violation of 21 U.S.C. § 841; and two possession of a firearm in furtherance of a drug trafficking offense counts in violation of 18 U.S.C. § 924(c). [Doc. 38].  Defendant Bangally Touray is charged only in Count One with the money laundering conspiracy involving the proceeds of a controlled substance.  [Id. at 1–2]. An arrest warrant was issued for Defendant on the same day that the indictment was filed.  [Doc. 45].

The below factual background is drawn from the parties' briefs, the documentary evidence, and the evidence at the hearing.  To the extent that there are any conflicts regarding the facts of this case, they are discussed below in the legal analysis.

### A.   Defendant's Arrest and the Search of His Residence and Vehicle

Special Agent Brian Haley ("SA Haley"), a criminal investigator with Homeland Security Investigations ("HSI"), was assigned to lead a team of agents in the arrest of Defendant.  [Doc. 255 at 7–8].  Prior to executing the arrest warrant, SA Haley and other agents were briefed by HSI SA Matthew DeVane regarding a long-term criminal

investigation wherein Defendant was one of the targets of the investigation. [Doc. 255 at 8, 46]. During the briefing, SA DeVane discussed potential risks related to the investigation such as prior arrests and searches that occurred in February of 2020. [Doc. 255 at 46–47]. Drugs, things indicative of drug trafficking, and firearms were discovered at both locations; and an individual identified in this case was arrested on a murder warrant. [Doc. 255 at 47]. Because the agents involved in the prior arrests saw guns at every location and had been in foot chases, SA DeVane emphasized that officer safety was paramount. [Id.].

On September 8, 2020, a team of law enforcement officers, led by SA Hayley, set up at Defendant's apartment complex with the intent to arrest Defendant at 9:00 a.m. unless they saw activity or anything that would cause them to start the operation early.[2] [Doc. 255 at 9–10]. According to SA Hayley, other law enforcement officers were present to ensure officer safety. [Doc. 255 at 10]. While surveilling Defendant's residence that morning, the officers observed Defendant's vehicle parked in front of the building and saw a light go on and off in his apartment. [Id. at 9–10].

---

[2] Some of the Atlanta Police Department ("APD") officers participating in the arrest wore body cameras. [Doc. 255 at 11]. A video representing what occurred during the execution of the arrest warrant was entered into evidence during the evidentiary hearing. See [Govt. Ex. 3].

3

SA Hayley, with five or six officers standing behind him out of sight, knocked on Defendant's door at 9:03 a.m. and said that there was a noise complaint.  [Doc. 255 at 10, 28].  When Defendant answered the door, SA Hayley asked Defendant if he was the owner of the apartment, and Defendant responded in the affirmative.  [Doc. 255 at 14–15].  After Defendant confirmed his identity, he was taken into the hallway outside of the apartment and handcuffed, and then the officers performed a protective sweep of the apartment.  [Doc. 255 at 15, 29].  SA Haley testified that the focus of the protective sweep was to look for other individuals who may pose a threat to officer safety.  [Id.].  SA Haley explained officer safety concerns include: not knowing the number of individuals who may be inside the apartment, the number of weapons inside, and whether there is someone lying in wait for the officers.  [Id.].

Because Defendant's arrest occurred during the height of the Covid-19 pandemic, SA Haley testified that Defendant was taken out of the apartment temporarily so that the agents could provide him with a protective mask.[3]  [Doc. 255 at 15, 29].  Defendant was taken back into his apartment because he did not have on

---

[3] Most of the officers were wearing masks for protection from Covid-19.  [Doc. 255 at 31].  The officers also wore body armor and had weapons.  [Doc. 255 at 28-29].

4

any shoes.[4] [Doc. 255 at 16, 40].  The officers asked Defendant to sit in a chair instead of on the couch to minimize the threat of there being a hidden weapon in the couch, since it had not been searched.  [Doc. 255 at 30, 40-41].  SA Haley placed the chair in the middle of the room so Defendant could sit comfortably, and to ensure that the officers could see the area around Defendant and his hands.  [Doc. 255 at 41].

Finding no other individuals in Defendant's apartment, the protective sweep ended, and SA Haley asked most of the agents to leave so that he could speak with Defendant.  [Doc. 255 at 15-16].  The protective sweep took less than a minute and a half. [Doc. 255 at 14–16].  SA Haley asked the other agents to leave so he could explain what was going on without multiple agents standing over Defendant.  [Doc. 255 at 17]. For officer safety, two or three APD officers remained at the apartment.  [Id.].  SA Haley asked Defendant if there were any guns in the residence to make sure the agents did not miss any threats.  [Doc. 255 at 18].  After retrieving a copy of the arrest warrant and presenting it to Defendant, SA Haley asked Defendant for permission to search his vehicle and apartment. [Doc. 255 at 19–20].  Despite Defendant's heavy accent, SA Haley testified Defendant responded in the affirmative.  [Doc. 255 at 20, 34].

---

[4]  One of the APD officers later retrieved a pair of shoes for Defendant. [Doc. 255 at 21, 24].

As he was completing the arrest warrant packet, SA Haley overhead someone ask Defendant if he was okay.  [Doc. 255 at 21].  Defendant did not appear unwell nor was he coughing a lot.  [Doc. 255 at 22].  As the search of Defendant's apartment continued, SA Haley noticed Defendant was sweating profusely.  [Doc. 255 at 22, 27].  Defendant was asked if he had Covid, and Defendant said "no."  [Doc. 255 at 23].  SA Haley placed his hand on Defendant's forehead, wiped it, and then placed a thermometer strip on it.  [Doc. 255 at 26].  Throughout the arrest and search, Defendant was responsive to SA Haley's questioning, he did not appear to have any difficulty understanding or comprehending the questions, and the answers he provided made sense in the context in which they were asked.  [Doc. 255 at 23].

SA Haley asked Defendant if he used the middle bedroom in the apartment, and the Defendant stated "no, he didn't, that his nephew used the middle room."  [Doc. 255 at 24].  The agents stopped searching the nephew's room and nothing of any evidentiary value was taken from that room.  [Id.].  In a closet associated with Defendant's bedroom, the officers found marijuana and a scale.  [Doc. 255 at 24–25].  While the search was occurring, Defendant asked if he could use the restroom and he was allowed to do so.  [Doc. 255 at 25–26].  Because Defendant was in custody, he was escorted to the restroom for officer safety.  [Doc. 255 at 37].  At no point did Defendant revoke his

consent to the search. [Id.]. Defendant was not advised of his Miranda rights either prior to or after the search of his vehicle or apartment. [Doc. 255 at 33]. Defendant was not told by anyone that he could withdraw his consent nor did any of the officers tell him that he could refuse to consent. [Doc. 255 at 35, 39]. Thereafter, APD officers transported Defendant to HSI's staff office. [Id.].

### B. Defendant's Statements

The day of the arrest, SA DeVane and FBI Special Agent Rob Matthews later interviewed Defendant in a holding cell at the HSI Atlanta Field Office. [Doc. 255 at 47–48]. The interview room was approximately 8 feet deep and 10 to 15 feet wide. [Doc. 255 at 48]. Defendant was not handcuffed, no weapons were drawn, and no physical force was threatened or used against Defendant during the interview. [Doc. 255 at 50]. Defendant was alert, cooperative and his answers to the questions posed to him seemed appropriate as asked. [Id.].

Someone told SA DeVane that Defendant had been coughing and Defendant had an adhesive strip thermometer on his forehead when SA DeVane entered the holding cell. [Doc. 255 at 50]. Although the strip thermometer indicated Defendant's temperature was elevated, a laser thermometer indicated his temperature was within the normal rage. [Doc. 255 at 51]. There was nothing about Defendant's behavior or

7

affect during the interview that led SA DeVane to believe that Defendant was in such medical distress that he could not comprehend what was happening or being asked. [Doc. 255 at 53].[5]

During the interview, both agents were wearing N95 masks and Defendant was wearing a face shield, a surgical mask and an N95 mask. [Doc. 255 at 54]. SA DeVane asked Defendant if he understood English, and Defendant responded, "a little bit" and "if I don't understand something, I'll just let you know." [Doc. 255 at 56]. To hear Defendant's responses better, SA DeVane asked Defendant to take off the blue surgical mask and Defendant did so. [Id.]. Defendant was also asked about his primary language, and he responded that it is "Soninke." [Doc. 255 at 56].[6] The purpose of SA DeVane asking those questions was to ensure that Defendant was able to communicate clearly and understand the agents. [Doc. 255 at 57]. SA DeVane testified that if Defendant had been unresponsive or if he had said he did not understand English, the questioning would have ceased. [Doc. 255 at 58]. SA DeVane then provided Defendant with his Miranda warnings using an HSI standardized Miranda

---

[5] SA DeVane had received basic training on medical emergencies, and his duties required him to make evaluations of people's health and, if necessary, call for medical assistance. [Doc. 255 at 52–53].

[6] Defendant did not attend school in the United States. [Doc. 255 at 75].

form that has the warnings written out and a separate warning at the bottom indicating that if the individual still wants to speak with the agent after receiving the statement of rights.  [Doc. 255 at 58; Govt. Exh. 1].

SA DeVane verbally advised Defendant that he had the right to remain silent. [Doc. 255 at 59].  When asked if he understood, Defendant said, "Yes." [Doc. 255 at 59]. SA DeVane advised Defendant that anything Defendant said could be used against him in court, and when SA DeVane asked Defendant if he understood, Defendant responded, "Yes."  [Doc. 255 at 59–60].  SA DeVane advised Defendant that he had the right to consult an attorney before making any statements or answering any questions, and Defendant said, "Um-hmm," which SA DeVane understood to be an affirmative response.  [Doc. 255 at 60].  SA DeVane told Defendant he had the right to have an attorney present during questioning, and when SA DeVane asked Defendant if he understood, Defendant responded "Yes."  [Id.].  SA DeVane advised Defendant that if he could not afford an attorney, one would be appointed for him before questioning, and Defendant again responded that he understood.  [Doc. 255 at 60–61].  Once he finished the rights advisement, SA DeVane asked Defendant if he had any questions, and Defendant said, "No."  [Doc. 255 at 62].  SA DeVane then asked Defendant if he would still answer some questions, and Defendant said, "Yes." [Gov. Ex. 2 at 5:36].

Defendant said he would sign the waiver and if he wanted to stop at any time, he would stop and ask for an attorney.  [Doc. 255 at 62].  Defendant then signed the <u>Miranda</u> rights waiver form.  [Doc. 255 at 63].

After Defendant signed the <u>Miranda</u> rights waiver form, SA DeVane interviewed the Defendant.  [Doc. 255 at 63].  At no point during the interview did Defendant ask to stop or ask for an attorney.  [Doc. 255 at 64].  After the interview, Defendant was taken to the US Marshals, who refused to take him into custody until he had a Covid-19 test.  [Doc. 255 at 64–66].[7]  Defendant had his initial appearance before Magistrate Judge Catherine Salinas via video-conference instead and entered a not-guilty plea.  [Doc. 255 at 67–68].  Defendant was responsive to Judge Salinas' questions and there was no indication he had any difficulty with the proceeding.  [Doc. 255 at 68].

## LEGAL ANALYSIS

First, Defendant moves to suppress the items seized pursuant to a search of his apartment on the grounds that the consent to search was involuntary.  [Doc. 222]; <u>see also</u> [Doc. 256 at 7–12].  Second, Defendant moves to suppress his statements by

---

[7] Defendant to Grady Hospital for a Covid-19 test, and several days later the test came back positive.  [Doc. 255 at 27].

arguing his waiver of Miranda was involuntary.  [Doc. 223]; see also [Doc. 256 at 12–13].  The undersigned addresses each motion in turn.

### A.    The Search of Defendant's Home

"A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'"  United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). Whether consent to a search is voluntary will depend on "the totality of all the circumstances," but the Supreme Court has provided a list of factors to be considered including: the age of the accused, a lack of education, low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, prolonged questioning, and the use of physical punishment.  Schneckloth, 412 U.S. at 226. The Government bears the burden of proving consent was voluntary.  United States v. Gonzalez-Zea, 995 F.3d 1297, 1306 (11th Cir.), cert. denied, 211 L. Ed. 2d 305, 142 S. Ct. 506 (2021).

In arguing that his consent to the search was involuntary, Defendant notes that he "was in-custody and not free to leave."  [Doc. 256 at 9].  While that is a factor in deciding if Defendant's consent was voluntary, it is not determinative.  Purcell, 236 F.3d at 1282.  The fact that Defendant was in handcuffs and not free to leave is a natural

consequence of the fact that law enforcement was at Defendant's apartment to arrest him; there is no evidence the arrest was an intimidation tactic being used to coerce Defendant into a search.  See Purcell, 236 F.3d at 1282 (holding that a suspect's continued detention during a traffic stop "was not unreasonable" and "did not indicate anything more than that the citation writing process was not yet complete").  Defendant also notes that the "officers were armed and wearing body armor."  [Doc. 256 at 9]. "Officers routinely carry weapons while on duty and, therefore, the mere presence of a weapon on an officer does not render an encounter with an officer unduly coercive and is insufficient to render a defendant's consent involuntary."  Gonzalez-Zea, 995 F.3d at 1307; see also United States v. Garcia, 890 F.2d 355 (11th Cir.1989) (holding consent was voluntary after fourteen armed agents descended on suspect's house and, after being refused unlimited consent to search entire residence, threatened to return with a search warrant).

Next, Defendant argues it is "unreasonable" to think that Defendant would know that he could have refused to consent to a search because the police "had just completed a [protective sweep] without his consent."  [Doc. 256 at 9].  As the Government correctly points out in response, binding Eleventh Circuit precedent holds that asking for consent to search a home after a protective sweep does not render the consent

involuntary.  [Doc. 257 at 16]; see also Garcia 890 F.2d at 360–61.  Indeed, it would be unreasonable for Defendant to assume that SA Haley could conduct a new search without permission given that SA Haley explicitly *asked* for Defendant's consent. [Doc. 255 at 19–20].[8]  The agents "never represented to [Defendant] that they were in possession of a search warrant, or that they could lawfully search his premises without his consent."  Garcia 890 F.2d at 361.  Nor has Defendant introduced any "evidence indicating a lack of mental capacity to understand his actions."  Id.  The earlier protective sweep does not change the conclusion.  Id. at 360–61.

Defendant next notes that no one advised him of his right to refuse (or withdraw) consent.  [Doc. 256 at 10].  Again, that is a factor to be considered, but the Eleventh Circuit has explicitly rejected the argument that a suspect's consent was necessarily "involuntary because [an officer] did not specifically inform him that he could refuse." Purcell, 236 F.3d at 1281–82.  Defendant argues the officers had "no reason" to take him back inside after the protective sweep, ignoring the fact that he was not wearing

---

[8] Defendant seems to question whether he consented at all, arguing SA Haley "was not sure if [Defendant] consented to the search."  [Doc. 256 at 11].  In fact, SA Haley credibly testified he "wasn't for sure if" Defendant said the word "yes," but he unequivocally understood Defendant consented to the search.  [Doc. 255 at 20].  There is no evidence suggesting that Defendant did not consent to the search.

shoes.  [Doc. 256 at 10]; see also [Doc. 255 at 16, 40].  He also argues the officers should not have let him back into the apartment if they "were concerned with 'officer safety,'" ignoring the fact that the officers had finished their protective sweep.  [Doc. 256 at 10].[9]  Defendant point to three other relevant factors: (1) he was not educated in the United States, (2) English is not his first language, and (3) he had Covid-19 at the time.  [Doc. 256 at 11–12].

While Defendant did not go to school in the United States, there is no evidence he "was so young or uneducated, or suffering from such a low intelligence that he was unable to understand" that SA Haley was asking for his consent to search.  United States v. Martinez-Leal, No. 1:11-CR-19-TCB-CCH, 2011 WL 3328907, at *30 (N.D. Ga. July 6, 2011), report and recommendation adopted, 2011 WL 3328682 (N.D. Ga. Aug. 2, 2011).  While there is evidence the officers sometimes had difficulty understanding Defendant because of his accent, there is nothing to indicate Defendant

---

[9] Defendant off-handedly argues that the "original search/protective sweep was not needed." [Doc. 256 at 10–11]. It was. Defendant was a suspect in a drug trafficking conspiracy, and during prior, related searches officers had found guns and an individual wanted for murder. [Doc. 255 at 46–47]. The fact that Defendant was taken into custody is not determinative because numerous people lived in the apartment and the officers did not know who was in the home.  See [Doc. 255 at 15, 29]; see also [Doc. 255 at 24].  Those circumstances more than justified a protective sweep.  See Maryland v. Buie, 494 U.S. 325 (1990).

ever had any difficulty understanding the officers.  See, e.g., [Doc. 255 at 53]; see also United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (finding a non-native English speaker's consent voluntary because there was "no evidence that [he] was confused by, or did not understand, any of [the officer's] questions").

And while Defendant had Covid-19, there is no evidence that it had any impact on Defendant's ability to understand the questions being asked.  See [Doc. 255 at 53, 68].  Defendant did not appear unwell nor was he coughing a lot.  [Doc. 255 at 22].  At most, Defendant was "sweating quite a bit" while law enforcement searched his apartment, and he may or may not have had an elevated temperature.  [Doc. 255 at 22, 51].  Defendant contends that he was not offered "food or other type of drink," but that is unsurprising since Defendant gave consent to the search of his car and apartment less than six minutes after police knocked on his door.  [Doc. 256 at 11–12]; see also [Govt. Ex. 3 at 3:53, 9:10].  Failing to offer Defendant food or drink for all of six minutes is not the kind of "deprivation of food" that rises to the level of coercive "physical punishment."  See Schneckloth, 412 U.S. at 226.  That is especially so where, as here, Defendant never asked for anything to eat or drink.  Notably, when Defendant asked if he could use the restroom, he was allowed to do so.  [Doc. 255 at 25–26].

Considering the totality of the circumstances, Defendant's consent to the search of his car and the apartment was voluntary.  No one threatened force or violence against Defendant, and he was not verbally "intimidated or browbeaten into consenting to the search." Purcell, 236 F.3d at 1281.  While Defendant was not advised of his rights, no one suggested to Defendant "that he had no right to refuse," and there is no evidence that Defendant "did not understand he could refuse the search." Id.; see also Schneckloth, 412 U.S. at 226–27 (holding that the government does not have a burden to show "defendant knew he had a right to refuse").  Defendant was not subjected to "repeated and prolonged" questioning before he gave consent to the search, and there was no "use of physical punishment" to coerce Defendant's consent. Schneckloth, 412 U.S. at 226.  In short, the totality of the circumstances demonstrate that Defendant's consent to the search was the product of his own voluntary, free, unconstrained choice. Purcell, 236 F.3d at 1281.

**B.   Defendant's Statements**

As with Defendant's consent to the search, the Government also has the burden of demonstrating that Defendant's statements were voluntary.  United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010).  A finding that Defendant's statements were involuntary turns on whether "the circumstances show that 'coercive police activity'

overcame the defendant's free will." <u>Arvelo v. Sec'y, Fla. Dep't of Corr.</u>, 687 F. App'x 901, 904 (11th Cir. 2017) (quoting <u>Colorado v. Connelly</u>, 479 U.S. 157, 163–64 (1986)). "Voluntariness is determined by an assessment of the totality of the circumstances, but that assessment must include an element of official overreaching to warrant a conclusion that a confession is involuntary under constitutional law." <u>Miller v. Dugger</u>, 838 F.2d 1530, 1536 (11th Cir. 1988). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." <u>Id</u>.

In arguing that his statements to police were involuntary, Defendant discusses his illness and notes that <u>Mincey v. Arizona</u>, 437 U.S. 385 (1978) is "the leading case on whether a health-related issue might affect a person's ability to give a voluntary consent/statement." [Doc. 12–13]. Defendant is right that <u>Mincey</u> is illustrative, and the stark difference between the facts of that case and those at bar serves to demonstrate that Defendant's statements were voluntary. Mincey had been shot, was partially paralyzed, and was rushed to the emergency room for immediate treatment. <u>Mincey</u>, 437 U.S. at 396. He had tubes in his throat to help him breath and, when the officers tried to question him, he was "unable to talk because of the tube in his mouth." <u>Id</u>.

While Mincey was drugged and in an intensive care unit, officers questioned him for hours even though "Mincey asked repeatedly that the interrogation stop until he could get a lawyer." Id.

Here, by contrast, Defendant was "sweating quite a bit," and he may or may not have had an elevated temperature. [Doc. 255 at 22, 51]. But contrary to his suggestion, Defendant did not appear unwell nor was he coughing a lot. [Doc. 255 at 22]. And Defendant's illness did not have any impact on his ability to understand or answer the questions being asked. See [Doc. 255 at 53, 68]. Defendant notes that he was not "offered any food or drink," but again he never asked for any food or drink. [Doc. 256 at 12–13]. That is not the kind of "coercive police activity" sufficient to negate "the defendant's free will." See Arvelo, 687 F. App'x at 904. Defendant vaguely states that his illness "is just one of the factors to be considered," but none of the other factors point to a conclusion that his statement was involuntary either. See [Doc. 256 at 13].

Defendant was provided with written Miranda warnings, which he signed. [Govt. Exh. 1]. SA DeVane also verbally advised Defendant of his rights, and Defendant indicated that he understood them. [Doc. 255 at 59–62]. Defendant notes that he would sometimes respond "without words," but the fact that he sometimes said, "Um-hmm," instead of "Yes" does nothing to show his statements were involuntary.

[Doc. 256 at 12]; see also [Doc. 255 at 59–60].  Defendant notes that English is not his primary accent, that he speaks with an accent, and that he was educated outside of the United States.  [Doc. 256 at 12–13].  But again, Defendant never had any difficulty understanding the questions being posed to him.  See Zapata, 180 F.3d at 1242. Defendant also points to the fact that SA DeVane was "armed" See [Doc. 256 at 13]. The fact that SA DeVane was armed when questioning Defendant does not nullify Defendant's consent.  See, Gonzalez-Zea, 995 F.3d at 1307 ("Officers routinely carry weapons while on duty and, therefore, the mere presence of a weapon on an officer does not render an encounter with an officer unduly coercive and is insufficient to render a defendant's consent involuntary.").

There is no evidence that SA DeVane—or anyone else—ever drew a weapon on or otherwise threatened Defendant during the questioning at the HSI offices.  The facts of this case are a far cry from the kind of coercive overreach that could render a defendant's statements involuntary.  See Beecher v. Alabama, 389 U.S. 35, 36–37 (1967) (holding a confession obtained after the defendant was shot in the leg was involuntary because one of the officers threatened to kill the defendant and the other officer fired a rifle next to the defendant's ear).  Defendant fully understood that he did not need to answer any questions, that his statements could be used against him, that

he had the right to have a court-appointed attorney present, and that he could stop the questioning at any time.  [Doc. 255 at 59–62].  Defendant freely chose to answer SA DeVane's questions, and, unlike Mincey, Defendant never asked to stop the interview and never asked for an attorney.  [Doc. 255 at 64].  There were no threats or promises made, Defendant's questioning was relatively short, and the officers did not engage in the kind of physical or psychological coercion that would render Defendant's statements involuntary.  The totality of the circumstances demonstrate that Defendant freely and voluntarily waived his <u>Miranda</u> rights.

## **CONCLUSION**

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motions ([Docs. 222, 223]) be **DENIED**.  There are no other pending matters before the Magistrate Judge, [10] and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

---

[10] As noted in the undersigned's previous Report and Recommendation, Defendants A.J. Touray and B. Touray have also filed Motions to Suppress Statements ([Docs. 23, 123]) that were deferred to the District Judge.  [Docs. 132, 135].

**SO ORDERED, REPORTED, AND RECOMMENDED**, this   22   day of

December, 2022.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE